[No. 85422-0.    En Banc.]
Argued May 10, 2012.    Decided October 18, 2012.

THE STATE OF WASHINGTON, *Respondent*, v. PHIENGCHAI
SISOUVANH, *Appellant*.

608

*Eric J. Nielsen* (of *Nielsen Broman & Koch PLLC*) and *Michael P. Iaria* (of *Law Office of Michael Iaria PLLC*), for appellant.

*Andrew K. Miller, Prosecutor*, for respondent.

*Neil M. Fox, Sheryl G. McCloud, Travis Stearns,* and *Ann E. Benson* on behalf of the Washington Association of Criminal Defense Lawyers and Washington Defender Association, amici curiae.

*Brian D. Buckley* and *Ewa M. Davison* on behalf of Fred T. Korematsu Center for Law and Equality, amicus curiae.

*Michele E. Storms,* on behalf of OneAmerica, amicus curiae.

*Jorge L. Baron,* on Northwest Immigrant Rights Project, amicus curiae.

*David Ko,* on behalf of Korean American Bar Association of Washington, amicus curiae.

*Teebah Alsaleh,* on behalf of Middle Eastern Legal Association of Washington, amicus curiae.

*Diane Narasaki,* on behalf of Asian Counseling and Referral Service, amicus curiae.

¶1 GONZÁLEZ, J. — On direct review, appellant Phiengchai Sisouvanh challenges the adequacy of the competency evaluation she received pursuant to RCW 10.77.060 prior to her trial and conviction for aggravated first degree murder. Sisouvanh immigrated to the United States from Laos at around five years of age and alleges that the court-appointed expert who conducted her evaluation failed to properly account for her distinct cultural background as a Laotian immigrant.

¶2 We affirm the trial court. The court-appointed expert who evaluated Sisouvanh reasonably explained the propriety of the tests he administered and his interpretation of Sisouvanh's behavior, and the trial court did not abuse its discretion by accepting the expert's examination and report as having been conducted in a qualified manner sufficient to satisfy RCW 10.77.060.

## I. FACTS AND PROCEDURAL HISTORY

### 1. *Sisouvanh's Crime*

¶3 On June 27, 2008, Sisouvanh committed murder. Sisouvanh met a pregnant woman that day and offered to give the woman spare baby clothes. Sisouvanh drove the woman to a highway turnout, stabbed her, and then proceeded to a secluded location where she cut the woman's abdomen open and removed the baby from the woman's womb.

¶4 Sisouvanh then drove to another location and called emergency services, reporting that she was giving birth and in need of assistance. She moved into the backseat of her car with her victim's child, partially undressed herself, and waited for an ambulance to arrive. Sisouvanh was taken to a hospital, where a doctor examined her and discovered that she had not given birth. Although Sisouvanh initially persisted in denying the doctor's allegation, eventually she admitted that she had cut the baby out of another woman. The doctor contacted police. A police officer arrived, and Sisouvanh said, "I know you have to read my rights." 5 Verbatim Report of Proceedings (VRP) (Jury Trial) at 551. Sisouvanh then admitted to and described her crime to the police. Sisouvanh's primary victim did not survive, but the decedent's child did survive.

### 2. *Preliminary Proceedings*

¶5 Sisouvanh was charged with aggravated first degree murder. Dr. Richard Adler was retained by the defense to investigate the propriety of the death penalty. Dr. Adler examined Sisouvanh; because Sisouvanh came to the United States from Laos at a young age, Dr. Adler consulted extensively with another doctor familiar with Laotian culture. The defense team then presented a mitigation package, including Dr. Adler's report among others, detailing Sisouvanh's difficult upbringing and questionable mental health. The prosecutor chose not to seek the death penalty.

¶6 On October 20, 2009, the trial court ordered a competency evaluation at Eastern State Hospital (Eastern) pursuant to RCW 10.77.060. The parties agreed to an evaluation by one qualified expert or professional person. Dr. Randall Strandquist was designated to evaluate Sisouvanh at Eastern and to submit a report on her competency to stand trial.

### 3. Competency Evaluation

¶7 Dr. Strandquist evaluated Sisouvanh's competency to stand trial based on various observations by Eastern hospital staff, the results of multiple diagnostic tests, and a formal forensic interview. Dr. Strandquist concluded that Sisouvanh was able to rationally understand and communicate and that her selective behavior to the contrary was a result of malingering, which consists of false or grossly exaggerated symptoms intentionally produced for some external purpose.

¶8 Dr. Strandquist considered numerous observations from hospital staff at Eastern. Upon arrival, Sisouvanh began treating a rolled-up blanket as a baby and telling others that the blanket was her child. Eventually, Sisouvanh stopped carrying the blanket, became social with peers, and was "clear in thought and speech and able to make needs known." 1 VRP (Competency Hr'g) at 22-25. Eastern staff noted inconsistencies in Sisouvanh's reports of her delusional beliefs, and one staff member reported his conclusion that she was very likely malingering. Staff members also observed that Sisouvanh stopped displaying delusional behavior in particular when she did not know she was being observed, but the delusions would return in interviews with doctors and other such formal settings.

¶9 Dr. Strandquist had numerous diagnostic tests administered, including the Wechsler Adult Intelligence Scale, the Personality Assessment Inventory (PAI), the Rorschach test, and the Miller Forensic Assessment of Symptoms (M-FAST). The intelligence testing showed that Sisouvanh

possessed a good attention span and a full scale IQ (intelligence quotient) of 72 (including a relatively low verbal score that might have reflected a verbal expression disorder). On the PAI, which obtains scaled answers to various questions in order to determine psychological impairment, Sisouvanh's answers "portrayed [her] as more psychologically impaired than realistically could be," resulting in a score of 129, with a score of 70 or above being a significant indicator that the subject is malingering. *Id.* at 15-16; *see also id.* at 14 (explaining that "it's a series of statements . . . and they can answer . . . false, [somewhat false,] somewhat true, [or] very true"). Likewise, on the M-FAST, which asks "about symptoms that are typically not found in legitimate psychopathology," Sisouvanh scored a 23, with a score of 6 or more indicating a likelihood of malingering. *Id.* at 19-20; *see also id.* at 20 (examples of test items include, "When I urinate, I see my urine as blue," and "I only hallucinate on Tuesdays at six o'clock"). Dr. Strandquist concluded that Sisouvanh likely was malingering.

¶10 Dr. Strandquist also conducted a formal forensic interview that focused on issues specifically related to competency to stand trial. The interview began with "basic historical questions," including the age Sisouvanh came to the United States, her family life, and her experiences with school and work. *Id.* at 26. Dr. Strandquist observed no signs of any thought disorder in Sisouvanh's presentation. When Dr. Strandquist began to ask Sisouvanh about the trial court, however, "the delusional thoughts kicked in." *Id.* at 28. Sisouvanh "started talking about her imaginary friend," asserted "her belief that she's a princess," and also claimed that "[s]he's a psychic and can see into the future." *Id.* at 29. In the midst of these delusions, Sisouvanh did acknowledge that she had been charged with first degree murder. Dr. Strandquist became frustrated and terminated the interview soon thereafter.

¶11 Dr. Strandquist concluded that Sisouvanh was competent to stand trial. This conclusion was based on Sisouvanh's ability to attend, rationally understand, and communicate.

*4. Competency Hearing*

¶12 At the competency hearing, Dr. Strandquist testified regarding his competency evaluation and report. The report itself was not filed into the record, but the transcripts make clear that the trial court and both parties received copies.

¶13 Dr. Strandquist's curriculum vitae was submitted as an exhibit, and he testified regarding his qualifications, including a master's degree in psychology and a doctorate in clinical psychology. As part of his education, Dr. Strandquist was "trained in the various unique characteristics of a variety of cultures." 1 VRP (Competency Hr'g) at 107. Dr. Strandquist also had substantial experience and education in conducting psychological examinations, including a one-year rotation at Harbor-UCLA Medical Center learning neuropsychological evaluations, an internship at Terminal Island Prison in California, and an internship at the Federal Medical Center in Fort Worth, Texas, where he learned how to conduct forensic evaluations. Dr. Strandquist also had approximately five years of experience at Eastern conducting forensic evaluations, and Dr. Strandquist testified that he had produced approximately 100 forensic reports during the previous year.

¶14 Defense counsel questioned Dr. Strandquist regarding his cultural competency to evaluate Sisouvanh. Dr. Strandquist explained that based on what he learned in the formal forensic interview—that Sisouvanh came to the United States when she was five years old, was socially active in high school, graduated and then obtained a nursing assistant certification, and passed her board exams on her first attempt—he judged her to be substantially acculturated to the United States. Thus, Dr. Strandquist concluded that he could rely on the tests he administered and his interpretation of Sisouvanh's behavior, without investigating her background any further, and without learning more about her Laotian culture.

¶15 After Dr. Strandquist testified but prior to the conclusion of the lengthy competency hearing, Sisouvanh filed a memorandum with the trial court arguing that Dr. Strandquist was insufficiently qualified to evaluate Sisouvanh for competency to stand trial, in particular because he lacked sufficient cultural competency. The trial court never explicitly ruled on that issue, nor was a request ever made for such a ruling.

¶16 Dr. Adler testified for the defense at the competency hearing. Dr. Adler asserted that Sisouvanh did not receive an appropriate evaluation from Dr. Strandquist because Dr. Strandquist failed to obtain sufficient background information and did not learn enough about Sisouvanh's culture. Dr. Adler asserted, without substantial explanation, that the PAI and M-FAST tests were "[c]learly inappropriate" to administer to Sisouvanh. 2 VRP (Competency Hr'g) at 269.

¶17 The trial court found Sisouvanh competent to stand trial. 3 VRP (Competency Hr'g) at 463-73; Clerk's Papers at 151-54. The court first acknowledged the testimony it had heard from Dr. Strandquist and Dr. Adler, whom the trial court referred to as "two highly-trained professionals." 3 VRP (Competency Hr'g) at 464. The court then specifically relied on Dr. Strandquist's testimony and report, among other evidence, to conclude that Sisouvanh was competent to stand trial.

### 5. Further Proceedings

¶18 The case proceeded to trial on a defense of insanity. Sisouvanh was convicted of aggravated first degree murder and sentenced to life without the possibility of parole. Sisouvanh then sought direct review with this court, which was granted.

## II. ISSUES AND SCOPE OF REVIEW

¶19 This case presents one essential issue for our adjudication: whether Dr. Strandquist's competency evaluation

satisfied the statutory requirement under RCW 10.77.060 that such an evaluation be conducted by a "qualified expert or professional person."[1]

¶20 Although Sisouvanh frames her primary assignment of error as the trial court's failure to ensure that "the person appointed or designated as the court's expert . . . under RCW 10.77.060(1)(a) be 'qualified,' " Br. of Appellant at 1, the substance of her argument is instead that Dr. Strandquist failed to conduct the competency evaluation *in a qualified manner*, by failing to obtain sufficient cultural competency through consultation or otherwise, *see, e.g., id.* at 8 ("Dr. Strandquist did not . . . acquire the requisite competence or consult or associate with an expert who had such competence before evaluating Ms. Sisouvanh."). There can be no genuine dispute that Dr. Strandquist was sufficiently qualified—at least initially—to be designated as the court's expert under RCW 10.77.060(1)(a), given his substantial education and experience related to competency evaluations and his ability to become more culturally competent if necessary. There is nothing in the record to show that Dr. Strandquist could not have learned more about Sisouvanh's cultural background had he deemed it appropriate or necessary. Dr. Strandquist acknowledged that cultural competency is an important aspect of diagnosis and that sometimes further investigation and research on cul-

---

[1] Sisouvanh's other assignments of error are frivolous. Sisouvanh assigns error to the trial court's overall finding that she was competent to stand trial, but her brief is devoid of any independent argument regarding that particular issue, and thus we will not address it. *See, e.g., State v. Brown*, 74 Wn.2d 799, 803, 447 P.2d 82 (1968). Sisouvanh also complains that Dr. Strandquist's report was not made a part of the record, but this assignment of error is entirely without merit. Unlike *State v. Heddrick*, 166 Wn.2d 898, 904, 215 P.3d 201 (2009), in which we disapproved of the fact that a court-appointed expert "never memorialized his findings in a report," in this case Dr. Strandquist drafted a report and the record establishes that the trial court and both parties received copies. The assignment of error fails because Sisouvanh points to no formal statutory requirement that the report be filed and she made no request to the trial court to have the report filed. *See State v. Nelson*, 103 Wn.2d 760, 766, 697 P.2d 579 (1985). Although the trial court's failure to file such a report as a matter of course "is obviously not appropriate," because "the court and both parties had copies," the oversight was harmless in this case. *Id.* at 767. No basis for relief has been shown as to this assignment of error.

ture is necessary to conduct a proper evaluation; he simply found that such steps were unnecessary in this case. The real dispute thus concerns whether Dr. Strandquist failed to conduct his evaluation of Sisouvanh in a qualified manner because he decided not to learn more about her background and culture.

¶21 We can address the adequacy of Dr. Strandquist's competency evaluation because the trial court implicitly decided the issue and the record—while incomplete—is sufficient to affirm the trial court's decision.

¶22 The trial court implicitly found that Dr. Strandquist conducted his competency evaluation in a qualified manner. Sisouvanh argued in a memorandum to the trial court that Dr. Strandquist was not qualified to evaluate her competency; the essence of Sisouvanh's argument was that Dr. Strandquist's evaluation was corrupted by his failure to obtain necessary cultural competence. The trial court never explicitly ruled on that issue, and it appears from the record that no such ruling ever was requested. Normally, that would render an issue waived and unreviewable, unless it could be raised for the first time on appeal. *See State ex rel. Am. Freehold-Land Mortg. Co. of London, Ltd. v. Tanner*, 45 Wash. 348, 355, 88 P. 321 (1907). However, the trial court referred to Dr. Strandquist as a "highly trained professional" and relied on his report in determining that Sisouvanh was competent to stand trial, and the trial court also explicitly rejected a later motion to disqualify Dr. Strandquist from testifying at trial, which was based on the very same argument concerning Dr. Strandquist's cultural competence. Thus, the trial court clearly found that Dr. Strandquist's competency evaluation was conducted in a qualified manner.

¶23 When an implicit finding can be inferred from the record as it can be in this instance, this court generally can review the finding. *See, e.g., Nott v. Crabtree*, 57 Wn.2d 838, 838-39, 360 P.2d 139 (1961); *Habich v. Habich*, 44 Wn.2d 195, 198-200, 266 P.2d 346 (1954). The record here indicates

that the trial court based its implicit finding on the qualifications and testimony of Dr. Strandquist, as well as his report. The trial court clearly considered Dr. Strandquist's submitted curriculum vitae and his testimony regarding his qualifications to conduct competency evaluations, as well as his report on Sisouvanh's competency. In sum, the record discloses that the trial court deferred to an expert whom it regarded as a "highly trained professional," and the trial court's implicit finding is now subject to our review on appeal.

■■ ¶24 The record before us is sufficient to affirm the trial court's decision. A trial court's decision "is presumed to be correct and should be sustained absent an affirmative showing of error." *State v. Wade*, 138 Wn.2d 460, 464, 979 P.2d 850 (1999). The party presenting an issue for review has the burden of providing an adequate record to establish such error, *id.*; *see* RAP 9.2(b), and should seek to supplement the record when necessary, *see* RAP 9.9, 9.10. Although this court may seek to supplement the record on its own initiative when appropriate, we may instead "decline to address a claimed error when faced with a material omission in the record," *Wade*, 138 Wn.2d at 465; *see also, e.g., In re Det. of Halgren*, 156 Wn.2d 795, 804-05, 132 P.3d 714 (2006), or we may simply affirm the challenged decision if the incomplete record before us is sufficient to support the decision, *see Easley v. Elmer*, 101 Wash. 408, 409, 172 P. 575 (1918), or at least fails to affirmatively establish an abuse of discretion, *see Lau v. Nelson*, 92 Wn.2d 823, 829, 601 P.2d 527 (1979). The glaring omission in the record before us is the absence of Dr. Strandquist's report on Sisouvanh's competency. It was not offered into evidence by either party. Presumably that report played a large role in the trial court's implicit finding that Dr. Strandquist's evaluation was conducted in a qualified manner. Rather than supplementing the record to include the report, Sisouvanh has instead attempted to place blame on the trial court for failure to file it and has left us with an incomplete record in

reviewing the trial court's implicit finding (which Sisouvanh failed to request and now alleges was erroneous). We need not supplement the record, nor will we decline to address the alleged error because, as discussed below, the record before us is sufficient to affirm the trial court's decision.

## III. ANALYSIS

*1. Standard of Review*

¶25 To address the adequacy of Dr. Strandquist's competency evaluation, we must first determine the appropriate standard of review. We already have held that various decisions by the trial court regarding competency are subject to an abuse of discretion standard. *See, e.g.,* *State v. Lord,* 117 Wn.2d 829, 901, 822 P.2d 177 (1991) (whether to order a statutory competency hearing); *State v. McDonald,* 89 Wn.2d 256, 269, 571 P.2d 930 (1977) (whether to admit relevant testimony of mental health experts), *overruled on other grounds by State v. Sommerville,* 111 Wn.2d 524, 531, 760 P.2d 932 (1988); *State v. Niblack,* 74 Wn.2d 200, 203, 443 P.2d 809 (1968) (whether to order additional examinations); *State v. Dodd,* 70 Wn.2d 513, 514, 424 P.2d 302 (1967) (determination of competency). For the reasons discussed below, we now hold that a trial court's determination of the underlying adequacy of a statutory competency evaluation also will be reviewed for abuse of discretion.

¶26 A trial court should order a new competency evaluation if an appointed expert or professional person conducts a statutory competency evaluation in a substantially unqualified manner. Initially, if there is reason to doubt a defendant's competency to stand trial, RCW 10.77.060(1)(a) requires the trial court to order that a qualified expert or professional person evaluate the defendant and draft a report for the court to consider in determining whether the

defendant is competent.[2] If an appointed expert conducts his or her examination in a substantially unqualified manner, however, the fundamental purpose of the requisite appointment, examination, and report will have been thwarted and both the statute and the trial court's order will have been violated. A trial court has "inherent power to enforce its decrees and to make such orders as may be necessary to render them effective," *Ronken v. Bd. of County Comm'rs*, 89 Wn.2d 304, 311-12, 572 P.2d 1 (1977), as well as inherent authority to order competency examinations to fulfill its "constitutional obligation to assure itself of the defendant's competence," *State v. Bebb*, 108 Wn.2d 515, 522, 740 P.2d 829 (1987). A trial court thus has the power and the obligation to ensure that a statutory competency evaluation is conducted in a qualified manner.

¶27 An abuse of discretion standard often is appropriate when (1) the trial court is generally in a better position than the appellate court to make a given determination, *see State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006); *State v. Collier*, 23 Wn.2d 678, 684, 162 P.2d 267 (1945); (2) a determination is fact intensive and involves numerous factors to be weighed on a case-by-case basis, *In re Parentage of Jannot*, 149 Wn.2d 123, 127, 65 P.3d 664 (2003); *State v. Garza*, 150 Wn.2d 360, 366, 77 P.3d 347 (2003); (3) the trial court has more experience making a given type of determination and a greater understanding of the issues involved, *Jannot*, 149 Wn.2d at 126-27; (4) the determination is one for which "no rule of general applicability could be effectively constructed," *id.* at 127; *Traver v. Spokane St. Ry.*, 25 Wash. 225, 252-53, 65 P. 284 (1901); and/or (5) there is a strong interest in finality and avoiding appeals, *Jannot*, 149 Wn.2d at 127-28. All of these reasons support an abuse

---

[2] Prior to May 1, 2012, and at the time of Dr. Strandquist's appointment to examine Sisouvanh, RCW 10.77.060 required the trial court to appoint *two* qualified experts or professional persons to conduct a statutory competency examination. *See* LAWS OF 2012, ch. 256, § 3. However, the prior version of the statute also allowed the parties to agree to the designation of only one expert, as occurred in this case. *See id.*

of discretion standard in reviewing a trial court's determination of whether a competency evaluation has been conducted in a qualified manner.

¶28 For example, no rule of general applicability can be effectively constructed to govern the adequacy of competency evaluations in every case. As we have noted in the past, the mental health field is " 'a discipline fraught with subtleties and nuances,' " *State v. Harris*, 114 Wn.2d 419, 440, 789 P.2d 60 (1990) (internal quotation marks omitted) (quoting *Ford v. Wainwright*, 477 U.S. 399, 426, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986) (Powell, J., concurring)), and there is "wide latitude for differing opinions," *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 894, 828 P.2d 1086 (1992). To this day, there is no clear consensus on a standard of practice for competency evaluations. CURT R. BARTOL & ANNE M. BARTOL, INTRODUCTION TO FORENSIC PSYCHOLOGY 163 (3d ed. 2012) ("The examination process itself varies widely according to the examiner's training and theoretical orientation."); GARY B. MELTON ET AL., PSYCHOLOGICAL EVALUATIONS FOR THE COURTS 157 (3d ed. 2007) (noting that "there is no standard protocol for adjudicative competency evaluations"); THOMAS GRISSO, EVALUATING COMPETENCIES: FORENSIC ASSESSMENTS AND INSTRUMENTS 79 (2d ed. 2003) ("Little is known empirically about the methods that clinicians actually use in collecting data for competence to stand trial evaluations.").

¶29 Further, there is a strong interest in finality and avoiding appeals in this context. The appointed expert's competency evaluation and report is only one consideration among many in a trial court's determination of the defendant's competency to stand trial, which itself is subject to an abuse of discretion standard of review. *See Dodd*, 70 Wn.2d at 514; *see also Lord*, 117 Wn.2d at 901; *State v. Ortiz*, 104 Wn.2d 479, 482, 706 P.2d 1069 (1985); *State v. Gwaltney*, 77 Wn.2d 906, 910, 468 P.2d 433 (1970).[3] The expert's examination and report may be of relatively little

---

[3] In *State v. Marshall*, 144 Wn.2d 266, 281, 27 P.3d 192 (2001), we mistakenly asserted, in dicta, that competency is "a mixed question of law and fact" for which

importance to the trial court in making its competency determination in a given case, regardless of whether the examination and report are accepted as adequate for the purpose of satisfying RCW 10.77.060. *See Dodd*, 70 Wn.2d at 514 ("The trial judge may make his determination from many things, including the defendant's appearance, demeanor, conduct, personal and family history, past behavior, medical and psychiatric reports and the statements of counsel."). Further, the victims of crimes have a strong and legitimate interest in the expeditious prosecution of competent defendants, particularly when it is undisputed that a defendant committed the charged crime.

¶30 Affording discretion to a trial court allows the trial court to operate within a " 'range of acceptable choices.' " *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)). Under an abuse of discretion standard, the reviewing court will find error only when the trial court's decision (1) adopts a view that no reasonable person would take and is thus " 'manifestly unreasonable,' " (2) rests on facts unsupported in the record and is thus based on " 'untenable grounds,' " or (3) was reached by applying the wrong legal standard and is thus made " 'for untenable reasons.' " *Id.* (quoting *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)). Under an abuse of discretion standard, so long as the underlying adequacy of a given competency evaluation is " 'fairly debatable,' " the trial court has discretion to accept or reject that evaluation in satisfaction of RCW 10.77.060. *Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979) (quoting *Hill v. C.&E. Constr. Co.*, 59 Wn.2d 743, 746, 370 P.2d 255 (1962)); *Myers v. Harter*, 76 Wn.2d 772, 781, 459 P.2d 25 (1969) (same). At the same time, appellate courts retain the authority to clarify and refine the outer bounds of the trial court's available range of choices and, in particular, to identify appropriate legal standards.

---

"we independently apply the law to the facts." To be clear, the law in Washington remains that competency determinations are reviewed for abuse of discretion.

*2. Minimum Cultural Competency in Competency Evaluations*

¶31 The discretion afforded to trial courts in determining the adequacy of a statutory competency evaluation is not without limits. As amici curiae rightfully point out, the basic need for cultural competency on the part of an expert or professional person conducting a competency evaluation is important and indisputable. *See, e.g.*, AM. PSYCHOLOGICAL ASS'N, SPECIALTY GUIDELINES FOR FORENSIC PSYCHOLOGY § 2.08 (2012), http://www.apa.org/practice/guidelines/forensic-psychology.aspx (last visited Oct. 17, 2012) ("When scientific or professional knowledge . . . establishes that an understanding of . . . cultural differences affects implementation or use of their services . . . forensic practitioners consider the boundaries of their expertise, make an appropriate referral if indicated, or gain the necessary training, experience, consultation, or supervision."); WEN-SHING TSENG ET AL., CULTURAL COMPETENCE IN FORENSIC MENTAL HEALTH, at ix (2004) ("The idea that mental health services should be provided in a culturally competent manner is commonly accepted nowadays . . . in contemporary multi-ethnic societies around the world."). A culture is " 'the way of life of a group of people,' " including the " 'patterns of learned behavior which are handed down from one generation to the next through the means of language and imitation.' " TSENG, *supra*, at 2 (quoting VICTOR BARNOUW, CULTURE AND PERSONALITY (1963)). Culture obviously plays a critical role in the proper evaluation of a clinical subject in a mental health evaluation. *See, e.g., id.* at 185-86 ("People from certain cultures may give a 'yes' answer that simply acknowledges they are listening to the question and not that they understand what is being asked."). Thus, a trial court could not properly accept the competency evaluation of an appointed expert who refused to acknowledge the importance of cultural competency and who failed to reasonably account for the need for cultural competency in his or her

evaluation. To be clear, even if an appointed expert acknowledges the importance of cultural competency, if the expert nevertheless fails to sufficiently account for the need for cultural competency in his or her evaluation of the defendant, the expert's evaluation will not meet minimum standards of adequacy.

¶32 Although cultural competency is a requirement in competency evaluations, the determination of how much investigation and research into particular cultures is necessary in order to conduct an adequate competency evaluation often will be at least fairly debatable in any particular case. Even members of majority groups belong to "many subcultures based on economic, occupational, religious, or geographic factors," and an appointed expert must determine which relevant cultures or subcultures, if any, merit special consideration. *Id.* at 301. This will depend in part on the particular characteristics of the defendant and the tests that the expert decides to administer. *See id.* at 97. Cultural competency in forensic evaluations is "a new field," and various "clinicians and scholars may hold different viewpoints." *Id.* at 29. Further, as noted above, there is no consensus regarding standard protocol for competency evaluations. In fact, some experts suggest that a competency evaluation usually should include only a "brief and focused social history"—simply in order to establish rapport with the subject and obtain a general sense of mental status—reasoning that "the functional focus of the adjudicative competency evaluation means that only limited social history information is needed." MELTON ET AL., *supra*, at 158-59 & n.223; *cf. In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 862, 16 P.3d 610 (2001) (noting that requiring competency to stand trial has only a " 'modest aim' " (quoting *Godinez v. Moran*, 509 U.S. 389, 402, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993))).[4]

---

[4] The need for sufficient cultural competency in forensic evaluations is important in part because the State's provision of mental health services must meet constitutional equal protection and due process requirements. The nature of

### 3. Dr. Strandquist's Cultural Competency

¶33 The record supports the trial court's finding that Dr. Strandquist conducted his competency examination of Sisouvanh in a qualified manner. The record specifically supports the conclusion that Dr. Strandquist reasonably accounted for cultural competency in his examination.

¶34 Dr. Strandquist's determination that Sisouvanh was competent to stand trial was based on the observations of staff at Eastern, a number of diagnostic tests, and Dr. Strandquist's own forensic interview of Sisouvanh. Sisouvanh argues that the tests were completely inappropriate due to her background as a Laotian refugee and Dr. Strandquist's failure to investigate that unique cultural characteristic. For the same reason, Sisouvanh argues that Dr. Strandquist did not obtain sufficient cultural competence to interpret her behavior as observed by Eastern staff and in his forensic interview. Sisouvanh overlooks Dr. Strandquist's reasonable explanation of why he felt his tests and interpretations were appropriate and informative.

¶35 Dr. Strandquist concluded that based on Sisouvanh's background and demeanor, she was sufficiently acculturated to the United States so that the tests he administered (and his interpretations of her behavior) were informative and useful. Dr. Strandquist commenced his formal forensic

---

the mental health field raises serious concerns regarding equal protection in particular:

> Extra effort may be needed when assessing foreigners, immigrants, people of ethnic or racial minorities, or people who are different from the majority in terms of age . . . or gender . . . because contemporary psychiatric knowledge and experience is based primarily on male adults from society's major ethnic group.

TSENG, *supra*, at 25-26. In this case, however, Sisouvanh challenges only whether Dr. Strandquist conducted a sufficient investigation into her background, without comparison to other evaluations conducted by Dr. Strandquist or other court-appointed experts or professional persons. Thus, we need only evaluate whether the trial court could reasonably conclude that Dr. Strandquist accounted for the need for cultural competence in his evaluation of Sisouvanh, and if there is a reasonable basis in the record, we must affirm the trial court's determination that Dr. Strandquist's evaluation was adequate.

interview of Sisouvanh with "basic historical questions," including "when she came [to the United States], what her family was like, . . . her experiences at school [and] work, [and her] drug and alcohol use," all of which presumably was detailed in Dr. Strandquist's report. 1 VRP (Competency Hr'g) at 26. Sisouvanh had no problem recalling relevant details, and she "went into detail about her clubs that she was involved in [at school]," among other things. *Id.* Dr. Strandquist discovered that Sisouvanh had lived in the United States since she was five years old, that she graduated high school, and that she subsequently obtained a certification as a nursing assistant and "took the boards, passed, and . . . did very well considering most people don't pass it on their first try." *Id.* at 99. Based on his interpersonal impressions of Sisouvanh and the background information he acquired, Dr. Strandquist's "clinical perception" was that "she was well-acculturated to the American way of life and . . . much more acculturated than someone who just came from Laos last year." *Id.* at 104. Thus, although the tests administered were not "normed on native-born Laotians," he concluded that they were sufficiently appropriate and informative to be part of his examination. *Id.* at 102.

¶36 Sisouvanh has not shown that Dr. Strandquist's basis for deciding not to seek out further cultural information and deciding to rely on Western-based diagnostic tests was unreasonable or contrary to the prevailing norms of the mental health field. To the contrary, Dr. Strandquist's decision finds support in the relevant literature, such as the work of amicus curiae Dr. Daryl Fujii:

> For Asian clients, a norm-based testing approach with Western-based tests is recommended if the client meets any of the following criteria: (1) the client received a college-level education with courses that are generally taught in English, (2) the client has lived in the United States for many years from a young age and is competent in English, (3) English is the primary language spoken at home, or (4) the client has performed at the average level or higher on national standardized tests (e.g., Stanford Achievement Test).

*Introduction, in* THE NEUROPSYCHOLOGY OF ASIAN AMERICANS 1, 8 (Daryl E.M. Fujii ed., 2011); *see also* TSENG, *supra,* at 68 (immigrants may be acculturated based upon motivation, education, and degree of interaction). Sisouvanh meets at least one of the criteria identified by Dr. Fujii as sufficient to support Western-based testing of Asian immigrants, given that she has lived in the United States from a young age and is at least competent in English; arguably she meets *three* of the four criteria, given that she also received a nursing assistant certification and passed her board exam. Thus, Dr. Strandquist's decision to treat Sisouvanh as an acculturated individual for whom Western-based tests would be sufficiently informative was not unreasonable.

¶37 The trial court was in the best position to evaluate Dr. Strandquist's explanation of his approach to cultural competence and his analysis of the defendant, and the trial court's determination that Dr. Strandquist's competency examination was conducted in a qualified manner is supported by the record. First, as noted above, Dr. Strandquist made a reasonable and supported judgment that Sisouvanh was sufficiently acculturated such that he could administer Western-based tests and interpret her behavior with reasonable confidence and without needing to research Laotian culture. Second, Sisouvanh's test results were extreme in their indication of malingering, which, in combination with her acculturation, made a culture-based misdiagnosis less plausible. Third, Dr. Strandquist's competency determination was based on numerous tests and observations, rather than any one source of information, rendering his determination more reliable. *Cf.* MELTON ET AL., *supra,* at 62 ("Many experienced clinicians advocate the use of a battery of tests of different types as an approach to overcoming the limitations associated with any one test."). The PAI and M-FAST, for example, rely on different types of responses: the PAI measures the degree to which relevant psychological items are reported, while the M-FAST measures whether

outlandish symptoms are reported at all. It is relatively unlikely that *both* tests would falsely indicate extreme malingering as a result of some abnormal cultural characteristic or response style. Finally, Dr. Strandquist's determination was based not only on test results but also on his direct observation of Sisouvanh's capacity to rationally understand and communicate. On the whole, and based on the record before us, it was reasonable for the trial court to conclude that Dr. Strandquist's competency evaluation was conducted in a qualified manner. We thus affirm the trial court.

## IV. CONCLUSION

¶38 It is critical that competency evaluations be conducted by qualified experts and in a qualified manner. There may be times when an otherwise qualified expert fails to reasonably account for the need for cultural competence, and we may, in an appropriate case, conclude that a trial court has abused its discretion by accepting a competency evaluation that did not reasonably account for the defendant's culture. But this is not such a case. Dr. Strandquist was sufficiently qualified to evaluate Sisouvanh, and the trial court did not abuse its discretion in accepting Dr. Strandquist's evaluation and report in satisfaction of RCW 10.77.060. We affirm Sisouvanh's conviction.

MADSEN, C.J., and C. JOHNSON, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, STEPHENS, and WIGGINS, JJ., concur.