# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 78487-1-I |
| Respondent, | |
| v. | DIVISION ONE |
| JERMOINE ANTHONY DAVIS, | UNPUBLISHED OPINION |
| Appellant. | FILED: October 7, 2019 |

CHUN, J. — Jermoine Davis appeals his convictions of assault in the third degree, assault in the fourth degree, and escape in the third degree following a jury trial. Davis challenges the trial court's failure to order a competency evaluation. He also claims the court abused its discretion by denying his request to represent himself and challenges the imposition of certain legal financial obligations. We remand to the trial court to strike the criminal filing fee from the judgment and sentence and to reconsider the imposition of the fee for the collection of DNA (deoxyribonucleic acid) consistent with this opinion. We otherwise affirm.

## I.
## BACKGROUND

The State charged Jermoine Davis with assault in the third degree, assault in the fourth degree, and escape in the third degree.[1] The charges stemmed

---

[1] The State initially charged Davis with only the two counts of assault.

from an incident that began when Davis violated the transit code of conduct on a community transit bus.

The trial took place approximately three months after the incident. According to the testimony of the State's witnesses, a bus driver noticed Davis, a passenger, drinking a can of beer. After parking at the Lynwood Transit Center, the driver told Davis to get off the bus. He refused. The driver called to report a transit conduct violation. Detective Bryan Martin, an officer assigned to the Community Transit Unit of the Snohomish County Sheriff's Office, responded. Detective Martin arrested Davis for unlawful transit conduct. As Detective Martin attempted to place Davis in his patrol vehicle, Davis forcefully pushed against him and escaped. As he fled, Davis ran behind another parked bus and collided with bus driver Allan Mehau, knocking him to the ground. Another police officer apprehended Davis a few blocks from the transit center and arrested him.

Mehau was the State's second witness at trial. Mehau testified about his injuries and when the State was about to introduce video footage from the transit center, Davis disrupted the testimony by talking loudly. The court excused the jury and indicated that it would recess to allow Davis to consult with his attorney.

A lengthy interruption of the trial ensued. Davis informed the court that he was unhappy with his attorney because she had not allowed him to review some of the State's evidence before trial.[2] He was also unhappy because his family was not present in court. Davis expressed frustration and said he felt it was

---

[2] Upon the court's inquiry, defense counsel later confirmed that she had provided Davis an opportunity to review the evidence before trial.

necessary to "lash out," even if that meant he would remain in jail for "365 days." Davis claimed the video evidence was "edited" and "bogus." Davis said he did not know whether "they're working together," apparently referring to defense counsel and the prosecutor. Davis said he was being "played out," and would, therefore, "act out if it helps."

Davis asked whether he could "cancel" defense counsel and represent himself. He repeatedly told the court to "[g]et this lady away from me," said he did not like defense counsel and would not "help" her. The court informed Davis he would need to answer some questions so the court could evaluate his request. But Davis continued to rant and talk over the trial judge, and would not allow him to conduct a colloquy regarding the risks and ramifications of proceeding without counsel. Davis insisted that he would not proceed with trial unless his family was present.

The primary source of Davis's frustration stemmed from his view that the charges were baseless, "unfair," and the result of a "racist system." He also expressed anger because he had been confined in jail for over three months, in "isolation," for offenses that he considered to be relatively minor. He maintained that the bus driver caused the incident to escalate by closing the bus door and not allowing him to leave the bus.[3] Davis insisted that he was justified in fleeing from law enforcement, because he had a legitimate fear of police officers who were "shooting everybody." When the court informed him that he was facing a

---

[3] Davis's assertion was consistent with both the bus driver's and Detective Martin's testimony.

3

potential sentence of five years on the felony count, he expressed outrage that he could be imprisoned for so long based on a "fake-ass assault."

Davis became increasingly agitated and launched into a profane attack on the court and everyone present in the courtroom. He refused to listen or let anyone else speak. In addition to his complaints related to the case, Davis hurled abuse at the court and veered into numerous other topics, including oppression, harassment, and racism in general. Some of his rantings were incomprehensible, including claims about "fear mongering," "modifying" his body, "growth hormone," "herpes outbreaks," and the court's alleged high school "alumni buddies."

Ultimately, the court directed security staff to move Davis to a nearby courtroom. A video system allowed Davis to see and hear the proceedings and there was a camera positioned on him, so he could be seen by the court and the jury. When the jurors returned to the courtroom, the court instructed them not to "infer guilt" or "prejudice" from Davis's absence. The State proceeded with its case and Davis watched remotely for the rest of the day. Defense counsel consulted with Davis at each recess, but he declined to return to the courtroom.

Davis returned to the courtroom the next day before the jury arrived. Davis said he would "rather not" sit next to defense counsel and insisted on watching the proceedings remotely. He reiterated his complaints about his attorney and the absence of his family. Davis said he did not seem to be "important enough to be taken seriously" and accused everyone in court of being "nonchalant" about the case. Given the circumstances, Davis maintained that he

4

had to "act out" in protest. Again, the court reluctantly ordered Davis to be removed from the courtroom.

After the State rested, Davis told his attorney that he wanted to testify and returned to the courtroom to do so. Davis admitted that he was drinking a beer on the bus and that he escaped from the police officer's custody. But he testified that his collision with Mehau was an accident and denied pushing Detective Martin. Davis said he escaped from Detective Martin by merely turning and sprinting away. He explained that did not see Mehau before hitting him "head on" and had no opportunity to adjust his course to avoid running into him. He insisted that the video footage did not show any contact between him and the Detective. Davis testified that he fled because he is generally "unnerved" by police officers and was especially so after he had been "entrapped" by the bus driver. Davis remained in the courtroom quietly for the remainder of the defense's case.

During closing argument, defense counsel recounted Detective Martin's testimony that Davis was yelling at the driver as he approached the bus. When counsel was about to play a portion of the transit center video footage, Davis interrupted, claiming that he was afraid and "entrapped" because the driver had locked the bus door and would not let him off. The court instructed Davis to remain silent, and when he continued talking, excused the jury. Before the jury left the courtroom, Davis remarked:

> Give me all the time so my family can flip out on you guys.
> Don't trap me on the bus. I don't appreciate shit like that.

She should have let me off. I'm not a child. Let me off the damn bus.

The court warned Davis that while his attorney was doing an "exemplary job" of attacking the State's evidence in her argument, his behavior was likely damaging his case. The court summoned the jury back to the courtroom. The court instructed the jury that Davis was not under oath and because his comments were not evidence to "disregard them entirely." The parties continued with argument without further interruption.

The jury convicted Davis on all charges. At sentencing, the prosecutor recommended a six-month sentence on the felony count. Defense counsel requested Davis's immediate release, in recognition of the fact that he had been in custody and in "segregation," since the date of the incident, for 99 days. The court imposed a standard range sentence of five months on the felony charge, concurrent 90-day sentences on the two misdemeanor counts, and legal financial obligations, including a criminal filing fee and DNA collection fee.[4] Davis appeals.

## II.
## ANALYSIS

### A. Competency Evaluation

Davis contends it was apparent at trial that he was experiencing delusions and paranoia and was therefore unable to assist in his own defense. Accordingly, he contends the court abused its discretion by failing to order an evaluation to determine his competency to stand trial.

---

[4] The court declined to impose community custody or a substance abuse evaluation, as recommended by the State.

6

The due process clause of the Fourteenth Amendment to the United States Constitution guarantees the fundamental right not to stand trial if an accused is legally incompetent. State v. McCarthy, 193 Wn.2d 792, 800, 446 P.3d 167 (2019); State v. Ortiz-Abrego, 187 Wn.2d 394, 402-03, 387 P.3d 638 (2017). RCW 10.77.050 encompasses this principle and provides, "No incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues."

Under the statutory definition, "'[i]ncompetency' means a person lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(15). Assisting in one's own defense means possessing "'an adequate recall of the factual events involved in the charge,'" being able to "'communicate those recollections'" to the attorney, and having "'both an intellectual and emotional appreciation of the ramifications and consequences of the crime charged.'" McCarthy, 193 Wn.2d at 806 (quoting 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 902, at 171 (3d ed. 2004). Neither the mere existence of a mental disorder nor the existence of delusions necessarily prevents a defendant from being competent. State v. Fedoruk, 5 Wn. App. 2d 317, 335, 426 P.3d 757 (2018), review denied, 192 Wn.2d 1012 (2019).

Under our statutory scheme,

[w]henever . . . there is reason to doubt [the accused's] competency, the court on its own motion or on the motion of any party shall either appoint or request the secretary to designate a

7

qualified expert or professional person, who shall be approved by the prosecuting attorney, to evaluate and report upon the mental condition of the defendant.

RCW 10.77.060(1)(a). To determine whether a competency evaluation is necessary, the trial court considers several factors including the defendant's behavior, demeanor, appearance, personal and family history, and psychiatric reports. McCarthy, 193 Wn.2d at 801; In re Pers. Restraint of Fleming, 142 Wn.2d 853, 863, 16 P.3d 610 (2001). The trial court should afford "considerable weight" to a defense attorney's opinion regarding a client's competency. McCarthy, 193 Wn.2d at 801; State v. Lord, 117 Wn.2d 829, 901, 822 P.2d 177 (1991). Our Supreme Court recently clarified that, in the absence of a request from counsel, we review the trial court's failure to sua sponte order a competency evaluation for an abuse of discretion. McCarthy, 193 Wn.2d at 803.

Under this standard, we will find error only when the trial court's decision is manifestly unreasonable or is based on untenable grounds. McCarthy, 193 Wn.2d at 803; State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012). We review the relevant record not to reach our own conclusions; but to determine if the trial court's exercised discretion was reasonable and tenable. McCarthy, 193 Wn.2d at 803. If the issue is "'fairly debatable,'" the failure to order an evaluation does not violate RCW 10.77.060, and the trial court did not abuse its discretion. McCarthy, 193 Wn.2d at 803 (quoting Sisouvanh, 175 Wn.2d at 623 (internal quotation marks omitted)).

It is undisputed that none of the parties to the case raised concerns about Davis's competence to stand trial at any point. Davis's attorney represented him

from the time of arraignment. He participated and interacted with the court in several court hearings prior to trial. Davis's conduct at trial led counsel to suggest only that it might be helpful for him to talk to a mental health professional. And although she had no information that Davis was prescribed medication to treat any mental health condition, based on his level of agitation, she wondered whether it might be helpful to investigate whether he was or could be medicated. These suggestions were reasonable under the circumstances, but did not indicate doubt about Davis's competence to stand trial.

Having interacted extensively with Davis and observed his demeanor, the court did not find a basis to doubt his capacity. During the trial, the court found Davis's behavior to be "manipulative." The court noted that when he was not in the courtroom and without an audience, Davis's behavior issues completely disappeared. The court also observed that during Detective Martin's testimony, when he identified Davis on the screen, Davis cooperated by "affably" waving and giving the officer a "peace sign."

At the conclusion of the trial, the court noted that further developments confirmed its assessment that Davis's behavior was disruptive "by design." The court noted that Davis conformed his behavior to the courtroom rules perfectly in order to testify. He then remained in the courtroom without interrupting the proceeding until almost the end of the trial.

The record supports the court's assessment. Before the first day of trial, there is nothing in the record to indicate that Davis was suffering from delusions or experiencing any mental health issues that interfered with his ability to

understand or engage in the proceedings. And when he made the decision to testify, Davis was able to communicate with counsel, return to court, and follow the court's instructions without incident. His trial testimony was respectful, responsive to the questions asked, and coherent.

Davis repeatedly made plain his intention to impede the court's ability to conduct the trial. For instance, he said while it would be "easy to go through with this," he would rather "just lash out." "And that might be an immature way to go about it, but I don't really care." At sentencing, Davis acknowledged that he had seized an "opportunity to protest" the unfairness of his circumstances.

Davis's interjections were often strategic and revealed his understanding of the facts and the nature of the proceedings. For instance, Davis interrupted the testimony and closing argument at the point when the jury was about to see damaging video evidence. And after refusing to respond when the court offered him the opportunity to allocute at sentencing, Davis corrected the court when the judge suggested that Davis's placement in segregation was the result of his own behavior. Davis stated, "No sir. I haven't gotten in any trouble here. I am not a disciplinary issue. . . . I ask the same questions, but they placed me in there anyway."

Contrary to Davis's argument, while his conduct before the jury during closing argument may not have been helpful to his case, it did not manifest an inability to assist in his own defense. He demonstrated a detailed recollection of the facts underlying the charges and ability to communicate those facts. His testimony provided key evidence to support his defense. And even though Davis

10

stated at certain points that he did not care about the outcome, his comments overall reflected an appreciation of the ramifications and consequences of the charges.

Davis relies on Fedoruk. In that case, competency was a longstanding issue. Fedoruk, 5 Wn. App. 2d at 319-20. After multiple pretrial hospitalizations and forced medication orders, an evaluator determined that Fedoruk was competent to stand trial. Fedoruk, 5 Wn. App. 2d at 323. But then, during the course of the trial, Fedoruk increasingly exhibited behavior that resembled his behavior during previous breakdowns. Fedoruk, 5 Wn. App. 2d at 337. The defendant repeatedly chanted and yelled unintelligibly, needed to be physically restrained, slid down in his chair and hit his head on the table, and collapsed on the floor. Fedoruk, 5 Wn. App. 2d at 337. Counsel, who had known the defendant for two years, raised concerns about competency multiple times during the proceeding. Fedoruk, 5 Wn. App. 2d at 338.

After the jury convicted him of murder, a psychologist determined that Fedoruk was not competent to proceed with sentencing. Fedoruk, 5 Wn. App. 2d 334. Several months later, an evaluator determined that he was once again competent and the court sentenced him. Fedoruk, 5 Wn. App. 2d at 334.

Division Two of this court reversed Fedoruk's conviction. Considering several factors, including the defendant's mental health history, his conduct during trial, and counsel's opinion, the court held there were reasons to doubt Fedoruk's competency and the trial court abused its discretion by failing to order a competency evaluation. Fedoruk, 5 Wn. App. 2d at 338-39.

This case is different in critical respects. There is nothing in the record to suggest that Davis had a history of mental illness. And there was no prior determination of incompetency. David did not display increasingly incoherent behavior. While he made some cryptic, offensive, and alarming remarks, he also consistently acknowledged that he was "acting out" to demonstrate his dissatisfaction. And importantly, counsel, who represented him for several months, expressed no concerns about competency.

Davis argues that despite being unaware of any mental health history, the court should have ordered a competency evaluation because he had been held in "isolation" for over three months and the effects of "prolonged solitary confinement" are well known. But while defense counsel confirmed at sentencing Davis's placement in "segregation," there are no facts in the record about the nature of that placement. And, in any event, since the court assessed Davis's conduct, appearance, and demeanor and reasonably found no basis to doubt his competency to stand trial, there was no need to speculate about the effects of his placement in jail.

The facts here are more analogous to those in McCarthy. An evaluator initially determined McCarthy to be incompetent. McCarthy, 193 Wn.2d at 796. After a significant competency restoration period, a jury found him competent to stand trial. McCarthy, 193 Wn.2d at 797. Both before and after the jury's determination of competency, McCarthy expressed delusional beliefs about conspiracies involving his former spouse and jailers harming him with toxic fumes. McCarthy, 193 Wn.2d at 798. McCarthy testified at trial, accurately

representing the facts as he believed them and the jury convicted him.
McCarthy, 193 Wn.2d at 799.

Our Supreme Court held that in spite of apparent delusional beliefs, the
evidence did not cast doubt on McCarthy's ability to assist in his defense.
McCarthy, 193 Wn.2d at 807. Specifically, there was no basis to conclude that
delusional beliefs affected McCarthy's ability to recall facts, communicate with his
attorney, or understand the consequences of the proceedings. McCarthy, 193
Wn.2d at 807. Therefore, the trial court's failure to sua sponte order another
competency hearing was reasonable and not an abuse its discretion. McCarthy,
193 Wn.2d at 807.

Here also, in the context of Davis's stated intent to disrupt the trial
process, his incomprehensible and inflammatory remarks did not create a reason
to question his competency to stand trial. Rather than evidence of incapacity, the
court determined that Davis's conduct was fueled by understandable frustration
and was a purposeful attempt to protest and obstruct the proceeding. The court
stated:

> I can certainly understand that he's frustrated. I can
> certainly understand somebody wondering how does
> drinking a beer in the backseat of the bus parlay into this? I
> get that. I understand that. And if I were in the defendant's
> shoes, I would perhaps be frustrated as well.
>
> But the problem isn't that he's frustrated. The problem is the
> way it's being manifested, interfering with our ability to have
> a trial, and I just cannot allow for that to happen.

13

The court's determination that there was no reason to doubt competency was tenable, in view of the record. The court did not abuse its discretion by failing to order a competency evaluation.

## B. Self-Representation

Davis next claims the trial court abused its discretion by denying his request to represent himself without conducting an adequate inquiry.

The state and federal constitutions provide criminal defendants with the right to self-representation. State v. Madsen, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). "This right is so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." Madsen, 168 Wn.2d at 503.

But the right to self-representation is neither absolute nor self-executing. Madsen, 168 Wn.2d at 504. The court may deny a defendant the right to self-representation if the defendant's request is equivocal, untimely, involuntary, or made without a general understanding of the consequences. Madsen, 168 Wn.2d at 504-05. Trial courts may limit the right to self-representation when there is a question about the defendant's competency to act as his own counsel. In re Pers. Restraint of Rhome, 172 Wn.2d 654, 661-62, 260 P.3d 874 (2011)

We review a trial court's ruling on a criminal defendant's request for self-representation for an abuse of discretion. State v. Coley, 180 Wn.2d 543, 559, 326 P.3d 702 (2014). Because a waiver of the right to counsel and to proceed pro se at trial involves a "fact-specific analysis" that is "best assigned to the discretion of the trial court," we will reverse the trial court's ruling only if the ruling

is "'manifestly unreasonable,' relies on unsupported facts, or applies an incorrect legal standard." Coley, 180 Wn.2d at 559 (quoting Madsen, 168 Wn.2d at 504).

Here, Davis's request was neither timely nor unequivocal. He raised the issue during trial. He also asked to be represented by the NAACP,[5] and insisted, multiple times, that he would not proceed, with or without counsel, unless his family was present in court. The trial court was unable to determine that his request to waive counsel was voluntary, knowing, and intelligent because Davis refused to allow the court to ask him any questions.

While Davis acknowledges that the trial court's attempt to conduct a colloquy was "unsuccessful," he maintains that the court was required to "revisit" the issue and conduct a colloquy once the court removed him from the courtroom and he was no longer exhibiting disruptive behavior. We disagree. The court repeatedly tried to engage Davis in a discussion regarding his request to proceed pro se and he refused. And he remained largely unresponsive to the court's instructions and questioning throughout the proceeding and continued to be intermittently disruptive, even after he was first removed from the courtroom. Under these circumstances, we cannot conclude that the trial court abused its discretion in denying Davis's request.

## C. Legal Financial Obligations

Finally, Davis asks this court to strike the $200 criminal filing fee and $100 DNA collection fee from the judgment and sentence.

---

[5] The National Association for the Advancement of Colored People.

House Bill 1783, which became effective on June 7, 2018, prohibits trial courts from imposing discretionary legal financial obligations (LFOs) on defendants who are indigent at the time of sentencing. LAWS OF 2018, ch. 269, § 6(3). This change to the criminal filing fee statute is now codified in RCW 36.18.020(2)(h). Under State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018), the 2018 changes to the LFO statutes, including the criminal filing fee statute, apply prospectively to cases pending direct appeal prior to June 7, 2018. Ramirez, 191 Wn.2d at 747. Accordingly, as the State properly concedes, the change in law applies to Davis. Based on his indigency at sentencing, we must remand to strike the criminal filing fee.

The amended law also provides that the DNA collection fee is no longer mandatory when the State has previously collected the offender's DNA as a result of a prior conviction. LAWS OF 2018, ch. 269, § 18. The record in this case indicates only that Davis has a prior felony conviction of attempted first degree theft from 2012. Then as now, the law requires the collection of a DNA sample from every adult or juvenile convicted of a felony. RCW 43.43.754(1)(a) (2019); Former RCW 43.43.754(1)(a) (2008). Nevertheless, the State argues that the record fails to establish that Davis's DNA was previously collected. See State v. Thibodeaux, 6 Wn. App.2d 223, 230, 430 P.3d 700 (2018), review denied, 192 Wn.2d 1029 (2019) (observing that defendants do not always submit to DNA collection despite being ordered to do so). Therefore, the State contends that the $100 DNA fee remains mandatory for Davis.

16

We remand to the trial court to determine whether the State has previously collected a DNA sample from Davis. The trial court, on remand, shall strike the DNA collection fee unless the State demonstrates that Davis's DNA has not been collected. See State v. Van Wolvelaere, 8 Wn. App. 2d 705, 440 P.3d 1005, 1007 (2019) (defendant's record of prior Washington State felony convictions gave rise to a presumption that the State previously collected a DNA sample).

We affirm Davis's convictions, but remand to the trial court to strike the criminal filing fee and reconsider imposition of the DNA collection fee.

_Chun, J._

WE CONCUR:

_____

_Andrus, J._