IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Petition for Visits With: | ) ) ) | No. 38141-2-III |
| R.J.,† | ) ) | |
| Minor Child, | ) ) | |
| RANDY and DIANE JONES, | ) ) | UNPUBLISHED OPINION |
| Appellants, | ) ) | |
| v. | ) ) | |
| BEAU JONES and GABRIELLE JONES, | ) ) | |
| Respondents. | ) | |

LAWRENCE-BERREY, A.C.J. — Randy and Diane Jones, paternal grandparents of

young R.J., appeal after the trial court summarily dismissed their petition for nonparental

visitation and awarded $1,500 in reasonable attorney fees and costs to R.J.'s mother,

Gabrielle Jones (now know as Gabrielle Blair).

The Joneses' petition alleged facts that showed a very strong bond between R.J.

and them. A dependency court had placed R.J. with them while his mother received

services to address her parental deficiencies. During and after the dependency, the

_____

† To protect the privacy interests of the minor children, we use their initials
throughout this opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title*
(Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018), http://www.courts.
wa.gov/appellate_trial_courts.

Joneses cared for R.J., who had significant medical needs.

But the petition arguably lacked a sufficient basis to warrant a hearing on the merits. To have warranted such a hearing, the trial court would have had to find that the Joneses' petition would more likely than not be granted. This required the Joneses to support their petition with a sworn statement setting forth specific facts showing by clear and convincing evidence that R.J. would suffer emotional or psychological harm if visitation was not granted. Reasonable trial courts could reach different conclusions on whether the Joneses' declaration met this evidentiary burden. We conclude the trial court did not abuse its discretion in summarily dismissing the Joneses' petition; however, the trial court did abuse its discretion in awarding reasonable attorney fees and costs, and we reverse it to that extent.

FACTS

*R.J.'s dependency proceedings*

In January 2019, R.J. was born with several birth defects that required ongoing care. He stayed in the NICU[1] after his birth due to being small for his gestational age. His mother, Gabrielle Blair, used marijuana in the third trimester of pregnancy to help with nausea. In the NICU, R.J. displayed symptoms consistent with his mother's drug

---

[1] Neonatal intensive care unit.

use; however, his birth defects were identified by doctors before Ms. Blair began using marijuana.

When he was two months old, R.J. was admitted to the emergency room with a severe head bleed. His father, Beau Jones, was charged with assault of a child in the first degree. The State found Ms. Blair demonstrated a lack of protectiveness for her children and had a history of alcohol abuse, and it filed a dependency petition for R.J. and his half-sister.[2]

In April 2019, R.J. was released from the hospital into the care of Randy and Diane Jones. Randy is Beau Jones's father and Diane is his step-mother. Ms. Blair's family lived across the state line in Idaho and would have had to complete additional requirements to care for R.J. during the dependency. Ms. Blair did not ask any of her family to begin the process to be approved. The record does not indicate what types of services Ms. Blair was required to complete, but she appears to have been compliant.

R.J. was returned to Ms. Blair's full-time care on July 10, 2019; his half-sibling was returned earlier. The Joneses continued to assist Ms. Blair with child care for R.J., seeing him twice a day, frequently caring for him overnight, and staying at the hospital with him during and after his August surgery.

---

[2] The half-sibling was placed with her father's relatives.

On September 15, 2019, Ms. Blair was arrested for driving under the influence. R.J. was again placed with the Joneses. Ms. Blair had two scheduled visits per week with R.J. during the placements, which she consistently attended. She was allowed to attend his medical appointments but often did not, in part due to scheduling conflicts with her own services.

R.J. remained with the Joneses until March 2020, when he was again placed in-home with his mother full time. Because of R.J.'s medical issues, the parties stipulated that when Ms. Blair needed child care for R.J., the Joneses would provide it. The Joneses cared for R.J. for three or four days each week during this period, including overnights.

The dependency was ended in approximately September 2020. R.J. remained in Ms. Blair's care at the conclusion of the dependency with no court-ordered time with the Joneses; however, the Joneses continued to provide substantial care for R.J. after the dependency, including multiple overnight visits per week.

In mid-November 2020, Ms. Blair took R.J. out of town and stopped accepting telephone calls from the Joneses. On December 2, she typed a Facebook message to them claiming that her boyfriend, Jerry, was offered a job in Texas with relocation pay and they moved to Texas on November 19. CP 108. She said that R.J. was calling Jerry "dad" and she did not want R.J. to know Beau was his father unless it came up when he was older.

4

Clerk's Papers (CP) at 108. Among other things, she claimed the Joneses had not

supported her during the dependency, and she told them she had changed her phone

number and the Facebook message would be their "last goodbye." CP at 109. Although

Ms. Blair told the Joneses she had moved to Texas, this was not true; she had moved to

Post Falls, Idaho.

*Randy and Diane Joneses' petition for visitation*

On December 31, the Joneses filed a petition to obtain nonparental visitation with

R.J. In their petition, they asserted it was not in R.J.'s best interest to cease contact with

them because they had cared for him so much. They expressed concern over changes to

R.J.'s routine, such as going to sleep by himself and not using a bottle, explaining that

because of R.J.'s traumatic life he needed more comfort than Ms. Blair was providing.

They pointed to the factors in RCW 26.11.040(4)(a)-(i) and stated they were "essentially

parental figures to [R.J.] through his darkest times." CP at 67. They acknowledged that

Ms. Blair had "remedied her situation," but argued they had "been there as security for

[R.J.] to be able to trust, love, and seek comfort." CP at 70. They argued "[R.J.] is an

innocent soul who deserves to still see us and be a part of our li[ves]." CP at 67.

The Joneses also asserted facts that could establish R.J. would suffer harm if

visitation was not granted. Specifically:

On the 16th of November when [Ms. Blair] came to pick up [R.J.,] he was bawling. He was not able to be consoled and was fighting to stay at our home. I thought it was because he knew he was leaving . . . and would not see us for a couple of weeks.

. . . .

. . . Out of 23 months of life he has been living with us for 12 of those months; in the hospital for about 3, and with us more than half time the rest of the months with the exception of December 2020.[3]

[The Joneses recount Ms. Blair's past struggles with alcohol and mental health, and assert]

. . . If we have visits we will at least still be a safeguard if something were to happen again and [R.J.] could stay with us.

. . . We never went more than a day or two in between seeing [R.J.] until he was taken in November for a vacation. The relationship is beneficial to [R.J.] because we built the bond with him as his caretakers and comfort[ers]. We have been through all his medical procedures and recoveries. We have been the ones to wake up with him in the night and build his confidence up to reach his goals. The bond we have is more than grandparents. . . . He is able to know our side of the family and be able to keep some consistency in his life.

. . . .

. . . We are concerned about what will happen [to R.J.] if there is a relapse with [Ms. Blair] but we will be there to support her if that happens.

CP at 64, 67-68, 70.

In her responsive declaration, Ms. Blair acknowledged her struggles with addiction and the role she played in R.J.'s trauma. She claimed she had only cut off contact with the Joneses and told them she was moving after they had failed to respect her boundaries.

---

[3] The Joneses' own timeline suggests that R.J. was with them most of his life, but less than described above.

6

 She also claimed they were "unwilling to accept that I am [R.J.]'s sole parent[4] and that they are not his caregivers or parents." CP at 165. She further claimed that they diminished Beau's culpability for assaulting R.J. and that they told Beau details of her and R.J.'s life that she did not want shared.

Ms. Blair made two separate requests for attorney fees and costs. Her first request was for attorney fees and costs on the basis that "the petition for visits was brought in bad faith or without reasonable basis." CP at 201. Her second request, made shortly thereafter, was for attorney fees and costs *in advance* for responding to the petition. Although she noted this second request for a hearing, nothing in the record shows the hearing occurred or the court awarded attorney fees and costs with respect to this request.

The Joneses filed two reply declarations—the first addressed Ms. Blair's request for attorney fees and costs and the second addressed her assertions. In their first reply declaration, they explained they have a net monthly income of $1,208, monthly expenses of $1,262, receive $668 in monthly Social Security, and have to pay for their own attorney. In contrast, Ms. Blair reported net monthly income of $1,268, monthly expenses of $395, and was receiving free legal representation.

---

[4] Beau Jones pleaded guilty to assault of a child in the first degree and a lifetime no-contact order was entered protecting R.J. Spokane County Superior Court No. 19-1-10410-32.

7

In their second reply declaration, the Joneses asserted that Ms. Blair's claims were untrue, that she knew they were untrue, and that they were inconsistent with her positive attitude toward them during the dependency. In support of this, they referred to a previously filed declaration from the dependency case in which Ms. Blair said she was not the type of person to take R.J. out of their lives.

In their second reply declaration, the Joneses again addressed how R.J. would be harmed if visitation was not granted: "Giving care to a grandchild with critical injuries heightened our emotional bond with him, differently than it would in a typical grandchild-grandparent relationship." CP at 250. R.J. "was attached to us and we fear the sudden rip away has done more emotional harm that is unnecessary." CP at 254.

*Superior Court's order on petition*

The superior court summarily dismissed the Joneses' petition without an evidentiary hearing. Among its findings, the court found the Joneses had not shown it was more likely than not that their petition would be granted and that it "was brought in bad faith or without a reasonable basis in light of the requirements of the law, so reasonable lawyer fees and costs should be awarded to [Ms. Blair]." CP at 319. The court also handwrote other findings in the space provided:

> This case is complicated by the fact that Grandparents acted as court appointed custodians while the parents were involved in a dependency action. However, the child was returned to mother[']s care, the dependency was dismissed, and serving as relative placement during a reunification that is successful should not alone be a basis for a petition for visitation.

CP at 319. The court awarded Ms. Blair $1,500 in attorney fees and costs for responding to the petition.

The Joneses appealed to this court.

## ANALYSIS

### LIKELIHOOD PETITION WOULD SUCCEED

The Joneses contend the trial court abused its discretion by summarily dismissing their petition for nonparental visitation. Because of the deferential standard for reviewing these types of trial court decisions, we disagree.

We review a trial court's decision on a petition for visits for an abuse of discretion. *In re Visits with R.V.*, 14 Wn. App. 2d 211, 221, 470 P.3d 531 (2020). Under an abuse of discretion standard, the reviewing court will find error only when the trial court's decision (1) adopts a view that no reasonable person would take and is thus manifestly unreasonable, (2) rests on facts unsupported in the record and is thus based on untenable grounds, or (3) was reached by applying the wrong legal standard and is thus made for untenable reasons. *State v. Sisouvanh*, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

Parents have a fundamental right to make decisions concerning the rearing of their children, including the right to make decisions about visitation with grandparents. *Troxel v. Granville*, 530 U.S. 57, 69-70, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Washington's nonparental visitation statute, chapter 26.11 RCW, thus starts with a presumption that "a fit parent's decision to deny visitation is in the best interest of the child and does not create a likelihood of harm or a substantial risk of harm to the child." RCW 26.11.040(2). A petitioner must rebut this presumption with "clear and convincing evidence that the child would likely suffer harm or the substantial risk of harm if visitation between the petitioner and the child were not granted." RCW 26.11.040(3). Only if the petitioner successfully rebuts this presumption does a court consider whether visitation is in the best interest of the child, including examining a list of nonexclusive statutory factors. RCW 26.11.040(4).

The petitioner must support the petition with an affidavit setting forth "specific facts" that establish visitation is warranted. *Visits with R.V.*, 14 Wn. App. 2d at 219; RCW 26.11.030(5), (6). The trial court does not hold an evidentiary hearing unless it finds it is more likely than not the petition will be granted, even if there are disputed facts in the record. *Visits with R.V.*, 14 Wn. App. 2d at 222; RCW 26.11.030(8).

It is obvious that the Joneses love R.J. They nurtured him through a critical time in his life. The State has ended the dependency proceedings, however, and determined that Ms. Blair is a fit parent to R.J. Under RCW 26.11.040(2), Ms. Blair's decision to deny visitation is presumed to be in R.J.'s best interest and presumed not to harm or create a substantial risk of harm to him. Thus, the Joneses needed to show more than they love R.J.; they needed to make a threshold showing of clear and convincing evidence that he would suffer harm or the substantial risk of harm if the court did not order visitation. The parties' factual disputes about the best interests of R.J. are not relevant until this presumption is rebutted.

We recently explained that the nonparental visitation statute was written in an effort to accommodate a parent's constitutional rights. *In re Petition for Visits with A.S.A.*, No 37890-0-III, slip op. at 12 (Wash. Ct. App. Mar. 29, 2022) (Pennell, J., concurring), https://www.courts.wa.gov/opinions/pdf/378900_pub.pdf. When a relative seeks to require a parent to provide visitation against the parent's better judgment, there must be a showing of a risk of harm. *Id.* at 7. The type of harm at issue is not something posed by the parent themselves. *Id.* at 9. Rather, to qualify for relief under chapter 26.11 RCW, a relative petitioning for visitation must allege and ultimately prove that denying

11

visitation will cause a substantial risk of psychological or emotional harm to the child. *Id.* at 13 (Pennell, J., concurring).

On appeal, the Joneses argue R.J. will suffer psychological or emotional harm if visitation is not ordered because he has formed an emotional attachment to them as his primary caregivers. In support of their argument, they cite Justice Madsen's dissent in *In re Parental Rights to D.H.*, 195 Wn.2d 710, 464 P.3d 215 (2020). There, the majority affirmed the trial court's termination of a parent's parental rights to her children. *Id.* at 728. In dissenting, Justice Madsen cited to various studies that found that children suffer significant emotional, psychological, and physical harm when separated from a parent. *Id.* at 736-38 (Madsen, J., dissenting). One study found that the effect of separation on children under two years of age was even more significant. *Id.* at 737.

The Joneses argue that they acted as R.J.'s parents for his first two years of life and so these studies establish that R.J. was harmed when he was separated from them. We disagree. The studies cited by Justice Madsen involved young children being *separated from their parent*. The cited studies do not present empirical evidence supporting the Joneses' argument that a child is harmed when they are separated from close caregivers and *placed with their parent*. In fact, one author refutes the Joneses' argument and emphasizes the desire of a child to be separated from caregivers and returned to their

parent: "The psychological attachment between a parent and a child is so strong that even after placement with a foster family after maltreatment from the biological parents, children long to return to them." *Id.* at 737 (citing Shanta Trivedi, *The Harm of Child Removal*, 43 N.Y.U. REV. L. & SOC. CHANGE 523, 528 (2019)).

In their petition, the Joneses asserted that R.J. would suffer psychological or emotional harm unless visitation was granted. These assertions can be separated into three subsets: (1) R.J. often cried when his mother picked him up, R.J. intensely cried when his mother took him for an extended trip, and a picture later showed R.J. looking despondent; (2) the possibility that Ms. Blair would relapse and R.J. would be at a substantial risk of harm; and (3) a very close relationship between R.J. and them due to their caring for R.J. and his significant medical needs a substantial majority of his life.

As previously noted, the trial court was required to dismiss the petition without a hearing unless it found, more likely than not, the petition would be granted. At this stage, it was incumbent on the Joneses to support their petition with a sworn statement setting forth specific facts showing by clear and convincing evidence that R.J. would suffer harm or the substantial risk of harm if the court did not order visitation. Arguably, they did not.

With respect to the first subset of assertions, infants cry. What the Joneses describe are temporary outbursts. Again, R.J. was taken by his mother, not some stranger.

13

These temporary outbursts are not clear and convincing evidence of lasting emotional or psychological harm.

With respect to the second subset of assertions, Ms. Blair was a fit parent at the time of the hearing. If she relapsed, and if R.J. was at risk, the State could file a dependency.

With respect to the third subset of assertions, this is the Joneses' strongest argument for nonparental visitation. The Joneses' relationship with R.J. was not the typical grandparent-grandchild relationship nor was it the typical grandparent-*dependent* grandchild relationship. The trial court could have found that the intense caregiving relationship, necessitated by R.J.'s medical needs, created in R.J. a unique emotional and psychological bond such that he would suffer harm if visitation with his grandparents was not ordered. But the lack of expert evidence supporting this finding renders the trial court's decision defensible. One simply does not know, by clear and convincing evidence, whether a child less than two years of age is at a substantial risk of emotional or psychological harm by the denial of nonparental visitation with a close caregiver. For this reason, the trial court did not abuse its discretion when it summarily dismissed the Joneses' petition.

The Joneses further contend the trial court erred by failing to take into account the mother's reasons for denying visitation and the factors in RCW 26.11.040(4)(a)-(i). Those factors are relevant only if a hearing is held. RCW 26.11.040(1)(a) (referring to a hearing pursuant to RCW 26.11.030(8)).

REASONABLE ATTORNEY FEES AND COSTS AWARD AT TRIAL

The Joneses contend the trial court erred in awarding Ms. Blair $1,500 in reasonable attorney fees and costs. We agree.

We review a trial court's decision to award attorney fees for an abuse of discretion. *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012).

In nonparental visitation cases, a parent may file a motion and request the petitioner pay attorney fees and costs in advance and prior to any hearing. RCW 26.11.050(1)(a). In that event, the court shall grant the motion and order the petitioner to pay reasonable attorney fees and costs in advance of the motion unless it finds, considering the financial resources of the parties, that it would be unjust to do so. *Id.* Although Ms. Blair filed such a request and noted it for a hearing, there is nothing in the record to show the hearing occurred or the court ruled on it.

But regardless of the financial resources of the parties, a court must award reasonable attorney fees and costs if it finds the petition "was brought in bad faith or

15

without reasonable basis in light of the requirements of RCW 26.11.020 through 26.11.040." RCW 26.11.050(1)(b). It was under this provision that the court awarded Ms. Blair $1,500. Specifically, the court ordered the Joneses to pay Ms. Blair's reasonable attorney fees and costs because their petition was "brought in bad faith *or* without a reasonable basis in light of the requirements of the law." CP at 319 (emphasis added).

The record is unclear which basis—bad faith or without a reasonable basis in law—the trial court relied on in awarding reasonable attorney fees and costs. On appeal, Ms. Blair argues both grounds support an award of attorney fees. We disagree.

### *Bad faith*

The term "bad faith" is not defined in RCW 26.11.050(1)(b). This is not problematic, given that this standard has been defined in prior cases.

A trial court has inherent authority to sanction a party for acts of bad faith, including engaging in improper litigation conduct. *Hedger v. Groeschell*, 199 Wn. App. 8, 13-14, 397 P.3d 154 (2017). This refers to vexatious conduct during the course of litigation, including delaying or disrupting litigation. *Id.* at 14.

Ms. Blair argues that the Joneses have engaged in "bad faith" because they assert here that they are merely grandparents, yet alternatively assert they are de facto parents or

16

have acted like R.J.'s parents. We see nothing inconsistent with these positions, much less bad faith.

Ms. Blair also argues that the Joneses have engaged in bad faith by requesting approximately 20 percent of total parenting time. But parties typically ask for more than they will likely receive. This is not bad faith.

We conclude the trial court abused its discretion if it found that the Joneses acted in bad faith. Such a decision rests on facts unsupported in the record and is thus based on untenable grounds.

### *Without a reasonable basis in the law*

As noted above, this was a case where reasonable minds could have differed as to whether the Joneses supported their petition with specific facts to warrant a hearing. While we defer to the trial court's discretionary decision that the submission was insufficient, we also recognize that the preliminary hearing could have come out the other way. We conclude that the petition set forth a reasonable basis in law.

ATTORNEY FEES AND COSTS ON APPEAL

Relying on RCW 26.11.050(1)(a), Ms. Blair requests attorney fees and costs on appeal. She argues she filed a request in the trial court for advance attorney fees and

costs, was awarded them, and should be awarded them on appeal. We disagree for two reasons.

First, although Ms. Blair did file a request for advance attorney fees and costs in the trial court, its award was not based on RCW 26.11.050(1)(a); it was based on RCW 26.11.050(1)(b), an erroneous determination that the petition was filed in bad faith or without a reasonable basis in the law.

Second, Ms. Blair did not file and note a request in the appellate court for advance attorney fees and costs on appeal. RCW 26.11.050(1)(a) requires this procedure, which was not followed here. For these reasons, we deny her request.

Affirmed; reversed in part.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____        _____
Pennell, J.                                                    Hill, J.P.T.