# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>J.L.<br><br>                      Appellant. | No. 58798-0-II<br><br><br>UNPUBLISHED OPINION |

VELJACIC, A.C.J. — J.L. appeals the superior court order granting Washington State Hospital's (WSH) petition for 180-day involuntary commitment pursuant to RCW 71.05.280. He argues that the trial court improperly excluded testimony regarding the level of certainty of identification by two eyewitnesses. J.L. also contends that his trial counsel was ineffective for failing to cite relevant authority—ER 801(d)(1)(iii)—as a basis for admitting the witnesses' statements. J.L. contends there was insufficient evidence supporting his involuntary commitment. Finally, J.L. argues that his appeal is not moot, although the 180-day commitment has passed.

We hold that J.L.'s appeal is not moot but hold that the trial court did not err in excluding the eyewitnesses' hearsay statements regarding their level of certainty when identifying J.L. as the assailant. We also hold that J.L.'s attorney was not deficient. Accordingly, we affirm the commitment order.

FACTS

I.  INCIDENT

On February 28, 2022, Carmen Reed and Hilleri West—paraeducators with the Pathways program[1]—waited for the bus on Mercer Island.  The two paraeducators were with three students, including Aviya Bentov.  While waiting, West saw a man cross the street toward them.  Reed looked up and saw a shadow approach.  The man began cursing and punching Bentov.  Reed and West yelled "'[s]top'" and "'[h]elp,'" but no one was around.  Report of Proceedings (RP) (Apr. 17, 2023) at 56.  Meanwhile, Bentov tried protecting his head with his hands.  The assault lasted for a few minutes, until Bentov fell to the ground and blood was seen flowing from Bentov's head, face, and hands.  After the attack, another student took a photo of the man while he walked away, and the police were called.

Officer Jacqueline Dawson responded.  Dawson talked with Bentov, Reed, and West.  Reed described the assailant to Dawson as "around five-seven, five-eight feet tall, stocky, Asian."  RP (Apr. 17, 2023) at 38.  Dawson also took photos of Bentov's injuries.

The next day, Dawson spoke with Reed and West separately.  After instructing them, she administered a photomontage prepared by another detective.  Both Reed and West signed the written instructions.  Separately, West and Reed identified photo 1—J.L.—as the assailant.  The State charged J.L. with assault in the second degree.

---

[1] The Pathways program is for young adults between the ages of 18 and 21 years old with disabilities including autism and down syndrome.  The program teaches the individuals life skills and prepares them to enter the world.

On May 18, J.L. underwent an outpatient evaluation of his mental condition, need for a designated crisis responder (DCR), and competency with Dr. Cynthia A. Mundt. Dr. Mundt opined in her report that J.L. lacked capacity to proceed to trial based on a diagnostic impression of schizophrenia by history. She recommended a period of competency restoration and an evaluation by a DCR prior to custodial changes.

In August, the trial court dismissed the charges against J.L. without prejudice and ordered him to undergo a civil commitment evaluation. On September 7, 2022, J.L. was admitted to WSH for evaluation and treatment.

J.L. was diagnosed with schizophrenia, a behavioral health disorder. WSH filed a petition to involuntarily commit J.L. for 180 days. WSH alleged J.L. should be committed due to being (1) gravely disabled as a result of his behavioral health disorder, and (2) because there was a likelihood that he would commit similar acts in the future even though the trial court dismissed the charges against him.

J.L. responded that there was insufficient evidence to support the petition for involuntary commitment. J.L. also initially requested a jury trial but later agreed to a bench trial on the petition.

J.L.'s bench trial lasted two days. On the first day, the trial court heard a preliminary motion from the State requesting J.L. be restrained during trial. The trial court heard testimony from Dr. Drew Calhoun. Overall, Dr. Calhoun expressed concern about J.L.'s dangerousness to others, his violent and assaultive behavior, his inability to maintain appropriate and safe behavior in the courtroom, and his escape risk.

Ultimately, the trial court granted the State's motion to restrain J.L. during trial. The trial court stated that it would be a "neutral fact-finder" and "ignore the fact" that J.L. was restrained during the bench trial. RP (Apr. 17, 2023) at 27.

The trial court heard testimony from five witnesses, including Reed, West, and Dawson, who recounted the aforementioned facts. Reed further testified regarding the photomontage Dawson provided to her. Specifically, Reed testified regarding her certainty in identifying J.L. as the assailant. Reed was shown exhibit 16, the photograph taken by one of the other students depicting the back of a man while walking away, to which she said, "it's the person that hit [Bentov]." RP (Apr. 17, 2023) at 39.

On cross-examination, the defense asked Reed about the photomontage:

> Q.: . . . So after you looked at the six-photo sheet of paper, do you recall talking to the officer afterwards?
> A. No. They just say "thank you" and left.
> Q. Did you tell her that you were 80 percent certain that that was the right person?
> A. No, I didn't say. They didn't ask me, and I just said, "Thank you."
> Q. Okay. So no conversation regarding—
> A. No.
> Q. —your degree of certainty was held?
> A. They told me before to take my time—
> Q. Mm-hmm.
> A. —and I just said, "Thank you," and, "It's difficult." And, you know, I told them difficult after what happened, but, *no, not engage in conversation at all.*
> [DEFENSE]: Okay. Nothing further.

RP (Apr. 17, 2023) at 52-53 (emphasis added).

As for West, she also testified to recognizing exhibit 16—a photo of a man walking away—saying, "[i]t's a picture of the individual who attacked [Bentov]." RP (Apr. 17, 2023) at 59. On cross-examination, the defense elicited the following testimony regarding West's identification of J.L. in the photomontage:

Q. Okay. And did you have a conversation with the officer after you put your signature on the—
A. I don't recall.
. . . .
Q. So after you picked the box, you don't recall making any statements to the officer?
A. Hmm-mm.
Q. So you don't recall telling her that you were 60 percent certain that that was the right person?
A. Hmm-mm.
[DEFENSE]: Okay. Thank you. I have nothing further.

RP (Apr. 17, 2023) at 67. West did an in-court identification of J.L. as the individual who attacked Bentov.

Dawson testified that Reed and West made statements regarding their level of certainty in identifying J.L. as the assailant but could not recall the specifics of the statements. Therefore, defense counsel tried to use exhibit 29—Dawson's police report—to get Dawson to say West's and Reed's statements into the record. However, the State objected:

Q. [DEFENSE] Thank you. So did you have a conversation with officer— with witness Reed following her looking at the photomontage?
A. Yes.
Q. Do you recall what she told you?
A. She was—
[STATE]: Objection; hearsay.
[DEFENSE]: Your Honor, it's *admission by party-opponent*.
THE COURT: I'm going to sustain the objection.
[DEFENSE]: Your Honor, it's directly rebutting what the other witness has indicated.
THE COURT: Well, the other witness isn't here; this is an officer.
[DFENSE]: But the information that was given is against their interest, so it's an *admission by a party-opponent*.
THE COURT: I realize you may be talking about a state agency but this officer is not a party, herself; the witness was not a party.
[DEFENSE]: She was offered by the—by the State; she's not my witness. She was offered by the State, one of the parties, not myself, so she's the opponent.
THE COURT: The State has not offered this report.
[DEFENSE]: The State is offering—this is in regard to the admission of the exhibit. This is why we're cross-examining at this point, so they're offering that exhibit.
THE COURT: They're offering the photograph.

5

[DEFENSE]: And as part of the offering the photograph, there are certain requirements that are made and part of that is how the officer performed the identification—

THE COURT: Correct.

[DEFENSE]: —pursuant to case law.

THE COURT: Correct.

[DEFENSE]: And I believe as part of the—*part of the procedure*, you know, and this is clearly, completely opposite of what the officer—what the witness has testified to, so I believe it's both relevant and it's *against . . . the party opponent*.

THE COURT: [State], did you want to respond to his argument?

[STATE]: Yes, Your Honor. The State has laid the proper foundation as far as the administering of the photographic [montage] to the questions that I asked Officer Dawson. Any concerns about statements made by Ms. West or Ms. Reed about their identification on the photo[montage]s should have been handled during cross-examination. This is not a statement that is being offered by the State, itself; this is hearsay. I don't have anything further.

THE COURT: Okay.

[DEFENSE]: Your Honor, it was handled during cross-examination. Both of those witnesses were asked questions regarding statements after the montage was shown to them.

THE COURT: Yes, and the Court recalls their responses, so that's in the record.

[DEFENSE]: Okay. All right.

RP (Apr. 17, 2023) at 79-81 (emphasis added).

Next, the State moved to admit the photomontage Dawson gave to Reed—exhibit 15. J.L. objected for two reasons. First, J.L. noted that Dawson had testified she had not seen J.L. before, but also testified that she saw the picture taken by one of the students, exhibit 16. J.L. also objected because of inconsistent testimony from Reed, West, and Dawson as to whether there had been conversations after the photomontage procedure about Reed's and West's level of certainty. J.L. argued that this put the "entire identification in doubt," and requested the court not admit Reed's and West's signed photomontages identifying J.L.—exhibits 13 and 15. RP (Apr. 17, 2023) at 84.

6

The State countered that exhibit 16 was a photo of a person walking away in which you cannot see their face. Therefore, the identification was not impacted even if Dawson saw it prior to the montage.

Ultimately, exhibits 13 and 15 were admitted with the court stating:

> Okay. Thank you. I think that the issues that have been raised by [defense] *would go to the weight to give to testimony of the witnesses rather than admissibility*. I think a proper foundation for the exhibits has been laid. The process by which the officer administered the photomontage has been explained in the testimony, and so I'm satisfied that these documents are what they are. I understand that the witnesses have given testimony, and so I can consider that. I'm going to admit Exhibit 15, and I will still admit 13 for those reasons.

RP (Apr. 17, 2023) at 85 (emphasis added).

The trial court then heard testimony from Dr. Calhoun and Dr. Pinar Kirsch, who reiterated their previous concerns about J.L. and provided additional information. Dr. Calhoun and Dr. Kirsch agreed that J.L. has disorganized thoughts, hallucinations, delusional beliefs, and impairments in his attention, insight, and judgment, all of which affect his mood and ability to control himself. Ultimately, they opined that J.L.'s schizophrenia diagnosis leads him to commit assaultive behavior due to his lack of volitional control.

Moreover, Dr. Calhoun and Dr. Kirsch opined that J.L.'s current condition makes it so that he is unable to make rational treatment decisions, and if released, he would not follow through with care. Dr. Calhoun and Dr. Kirsch added that if J.L. was released, he would be unable to meet his basic needs and care, raising the substantial likelihood that J.L. would have reoccurring assaultive incidents. Finally, they opined that they did not recommend a less-restrictive alternative means to hospitalization for J.L.

Next, the trial court heard testimony from Cara Bowyer, supervising nurse at WSH. Bowyer described J.L. as unpredictable, impulsive, and assaultive. She then highlighted that at times, after J.L. assaults someone and asks why he did so, his response is, "'for no reason.'" RP (Apr. 17, 2023) at 106.

Further, Bowyer stated J.L. makes delusional statements, including that he has to fight because he needs to finish some type of military training. She also said that she has had to place J.L. in seclusion due to this behavior. Bowyer recounted an incident where she went to speak with J.L. to release him from seclusion, and J.L. jumped up and tried to punch her in the face.

Finally, the trial court heard from J.L.'s father, Heng Da Li. Li stated that this was J.L.'s second time at WSH but that prior to his commitment, J.L. lived with him and his wife. He added that J.L. was a "very good boy, nice heart." RP (Apr. 18, 2023) at 6. Li stated that J.L. did well until one day, J.L. said someone was "talking in his mind" and started getting into trouble. RP (Apr. 18, 2023) at 6. Li noted that he went to see J.L. at WSH and thinks J.L. is getting worse, which is making him worry. Nevertheless, Li stated that if J.L. was returned home, J.L. would be cared for by his family and that they would include a doctor and psychiatrist to help. Li acknowledged there would be a risk to caring for J.L., but he "can handle [that]." RP (Apr. 18, 2023) at 10.

Following closing arguments, the trial court granted the State's petition for 180-day involuntary commitment, deeming it appropriate pursuant to RCW 71.05.280(3)(b) and (4). As to RCW 71.05.280(3)(b), the court stated the following:

> When the eyewitnesses, the teachers, testified, they were both clear that [J.L.] was the attacker. They both identified him here in the courtroom. They also talked about what happened in the photomontage. They described that they were provided photographs, after being given instructions. They testified that they signed both the instruction sheet and the sheet that has the photos next to photo number one, which

8

is the photo of [J.L.]. In their minds, at the time, they believed that they had identified the person who committed the attack.

*They were asked questions about whether or not the officer who administered the photomontage spoke to them after, and they both said, no, there was no conversation. We later learned from Officer Dawson that she did ask a question to the effect of, "How sure are you?" or something to that effect.*

*Unfortunately, this alleged contradiction in the testimony was not properly fleshed out when the witnesses were on the stand. If a witness is giving inconsistent statements, that needs to be addressed with that witness. Officer Dawson could not have testified as to what either witness thought or recalled. And to a certain extent, if there was any question about the witness's memory, it would have been helpful if they had been shown what, I think was, Defense [exhibit] 29. It was attempted to be admitted later. But if that had been shown to them to refresh their recollection, I think there could have been more fruitful testimony on this issue.*

As it stands, that was not done. The Court is taking the witness testimony as it is. I'm finding that what they stated about their identification of [J.L.] was credible. I do not believe that the process was tainted. Officer Dawson said that she had only seen, I think it's, Exhibit 16. It's the photo of a person walking away. She said that that was the only photo she had seen prior to administering the montage. Nobody's face is shown in that photograph. It's the back of a person. And so I don't think her seeing that photograph was prejudicial in any way.

She also testified that another officer in her department prepared the montage. Another officer chose the photographs that were going to be included. All she did was simply deliver those to the two witnesses who testified and looked at those.

So I'm not finding that there was any process that was tainted. I believe that the photomontage was sufficient. The witness testimony, as I said, was credible, and so I do believe that [J.L.] has been properly identified as the person who made the attack on [Bentov].

RP at (Apr. 18, 2023) at 27-29 (emphasis added). The court further found that J.L. committed assault in the second degree as of result of his behavioral disorder and presented a substantial likelihood of repeating similar acts. Additionally, the court found that J.L. required greater care than his family could provide at the time, making involuntary commitment appropriate.

The court entered written findings and conclusions of law supporting a 180-day involuntary commitment order. J.L. appeals.

ANALYSIS

I.    MOOTNESS

J.L. concedes that the 180-day involuntary commitment has run its course.  However, he argues, and the State concedes, that J.L.'s appeal is not moot.  *See In re Det. of M.K.*, 168 Wn. App. 621, 279 P.3d 897 (2012) (holding that an involuntary commitment order that has since expired is not moot because of adverse consequences attended to future involuntary commitment proceedings).  We agree with J.L. and accept the State's concession.  J.L.'s appeal is not moot.

II.    EXCLUSION OF WITNESS STATEMENTS REGARDING LEVEL OF CERTAINTY & ER 801(d)(1)(iii)

Relying on *State v Grover*, 55 Wn. App. 923, 780 P.2d 901 (1989), and *State v. Jenkins*, 53 Wn. App. 228, 766 P.2d 499 (1989), J.L. argues that a liberal construction of ER 801(d)(1)(iii) includes not just nonverbal identification made by a witness photomontage out of court, but also verbal identification.

The State counters that although *Grover* and *Jenkins* expanded the scope of ER 801, out-of-court statements regarding the identification of a person do not include statements pertaining to the level of certainty of the identification.  The State further argues that even if the trial court concluded that the statements were admissible, West also identified J.L. in court.  We agree with the State.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard.  *State v. Griffin*, 173 Wn.2d 467, 473, 268 P.3d 924 (2012).  The trial court abuses its discretion when it adopts a view that a reasonable person would not take, its decision is based on facts unsupported in the record, or its decision was reached by applying an incorrect legal standard.  *State v. Sisouvanh*, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

A.      Legal Principles

Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted.  ER 801(c).  Hearsay is inadmissible unless it falls under an exception.  ER 802.

A statement is not hearsay if "[t]he declarant testifies at the trial . . . and is subject to cross examination concerning the statement, and the statement is . . . (iii) one of identification of a person made after perceiving the person."  ER 801(d)(1).  ER 801(d)(1)(iii) "does not require that the statements be elicited from the declarant but may be admitted through testimony of another person who heard or saw the identification."  *Grover*, 55 Wn. App. at 932.  However, even if there is witness identification testimony that is unclear or inconsistent, the uncertainty only goes to the testimony's weight, not its admissibility.  *State v. Vaughn*, 101 Wn.2d 604, 610, 682 P.2d 878 (1984).

Issues of witness credibility are matters exclusively reserved for the finder of fact, and we will not review them on appeal.  *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

B.      Analysis

At trial, J.L. seeking admission of the statements regarding certainty, argued the statements were "part of the procedure" and an "admission by a party-opponent."  RP (Apr. 17, 2023) at 80-81.

We need not decide whether the trial court erred in excluding Reed's and West's statements relating to certainty, because any error is harmless.

When considering whether an error is harmless, the question is whether there is a reasonable probability that the outcome of the trial would have been different without the inadmissible evidence.  *State v. Gower*, 179 Wn.2d 851, 857, 321 P.3d 1178 (2014).

We conclude any error is harmless on these facts because the evidence included three identifications. Both West and Reed separately identified the same assailant, J.L., from the montage. West and Reed had a picture of the assailant, and West identified J.L. as the assailant in the courtroom. Even if each of Reed's and West's identifications were associated with lower rates of certainty, the fact that they separately selected the same assailant, that they had a picture of a side view of the assailant, and that West identified J.L. in the courtroom is sufficient to support the court's grant of the petition; the outcome would not have been different with the admission of the statements regarding certainty. Accordingly, J.L.'s argument fails.

III.     INVOLUNTARY COMMITMENT PURSUANT TO RCW 71.05.280(3)(b)

Next, J.L. argues that the trial court erred when finding and concluding J.L. committed assault in the second degree, which provided the basis for his involuntary commitment. He also argues that the trial court erred in finding that both witnesses identified J.L. as the assailant in the courtroom.

The State argues that the trial court properly found J.L. committed the act of assault in the second degree and presented a substantial likelihood of repeating similar acts, making involuntary commitment necessary and appropriate under RCW 71.05.280(3). We agree with the State.

A.     Legal Principles

A person may be involuntarily committed for up to 180 days of involuntary treatment if they have been found incompetent to stand trial and criminal charges have been dismissed, have committed acts constituting a violent felony, and "presents a substantial likelihood of repeating similar acts" due to a behavioral health disorder. RCW 71.05.280.

For a bench trial, "appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise." *Id*. at 106. Findings of fact that are unchallenged are treated as verities on appeal. *Id*.

In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010). These inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Salinas*, 119 Wn.2d at 201. Further, we must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence. *Homan*, 181 Wn.2d at 106.

B.     Analysis

Notably, the parties do not dispute that the trial court dismissed the charges against J.L. after he was found to lack the capacity to proceed to trial based on a diagnosis of schizophrenia nor that the dismissed charge of assault in the second degree is a violent felony. Further, the record is clear that Reed and West testified that on the day of the incident, they saw a man, who they later identified as J.L. in a photomontage, cross the street where they waited with three of their students for the bus. They also testified that J.L. began yelling profanities and punching Bentov until Bentov fell to the ground and blood covered his face, mouth, and hands. Bentov's head injuries and gashes required staples. The record is also clear that West identified J.L. in the courtroom on the first day of trial as the assailant.

13

Additionally, Dr. Calhoun and Dr. Kirsch testified that they believe that J.L. presents a substantial likelihood of repeating similar assaultive acts if released from commitment. They each pointed to J.L.'s lack of insight into his mental health and his refusal to engage in treatment as concerns. Testimony also showed that J.L. continued to engage in assaultive conduct after being admitted to WSH, including trying to punch staff in the face when trying to speak with him prior to releasing him from seclusion, attempting and succeeding in assaulting others in the ward, and stating he needed to fight in order to complete military training. Accordingly, sufficient evidence supports the trial court's findings that J.L. committed assault in the second degree, the charges were dismissed, and there was a substantial likelihood that he would commit similar acts in the future if released.

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, J.L. asserts he was denied effective assistance of counsel because his trial attorney failed to cite relevant authority—ER 801(d)(1)(iii)—which he argues allows Dawson to testify about Reed's and West's statements to Dawson regarding their level of certainty in identifying J.L. as the assailant.

The State responds that defense counsel was not deficient as his decision to not elicit further testimony at the time of Reed's and West's cross-examination could be seen as strategic. We agree that J.L.'s ineffective assistance of counsel claim fails.

### A.    Legal Principles

In order to establish a denial of effective assistance of counsel, the defendant must demonstrate that (1) his attorney's performance was deficient and (2) his attorney's deficient performance prejudiced him. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (applying *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052 80 L. Ed. 2d 674 (1984)).

14

Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

A defendant alleging ineffective assistance of counsel must overcome a strong presumption that counsel's performance was reasonable. *State v. Crow*, 8 Wn. App. 2d 480, 507, 438 P.3d 541 (2019). "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). If one prong of the test fails, we need not address the remaining prong. *Crow*, 8 Wn. App. 2d at 507.

A defendant can establish prejudice only when his attorney's "'errors [are] so serious as to deprive [the defendant] of a fair trial.'" *Thomas*, 109 Wn.2d at 225-26 (quoting *Strickland*, 466 U.S. at 687). We review claims of ineffective assistance of counsel de novo. *State v. Stotts*, 26 Wn. App. 2d 154, 162, 165, 527 P.3d 842 (2023).

B.      Analysis

Here, while J.L.'s counsel failed to cite to ER 801(d)(2)(iii) to support J.L.'s argument, because we have previously concluded any error from the exclusion was harmless, J.L fails to show prejudice.

That is, even if we were to conclude counsel's performance was deficient for not expressly arguing ER 801(d)(1)(iii), that error would be harmless as expressed above. *See In re Det. of Kistenmacher*, 163 Wn.2d 166, 174, 178 P.3d 949 (2008) (applying the harmless error standard is not unprecedented in civil commitment cases in Washington). Since the outcome would not change, there is no prejudice and the claim for ineffective assistance of counsel necessarily fails.

15

CONCLUSION

We affirm the trial court's 180-day involuntary commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Lee, J.

_____
Price, J.

16