IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86842-0-I |
| Respondent, | |
| v. | DIVISION ONE |
| JESSICA MARIE MULLINS, | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — Jessica Marie Mullins appeals the revocation of her mental health sentencing alternative (MHSA) and subsequent sentence. Mullins argues that her MHSA was improperly revoked because Department of Corrections (DOC) personnel and her treatment providers did not comply with their statutory duties and the trial court's findings were not supported by the evidence. She also claims the trial court violated her right to counsel by not allowing her to finish closing arguments at the revocation hearing and that she was deprived of effective assistance of counsel during sentencing because her counsel did not seek an exceptional sentence downward based on her mental health. Finally, she argues that the court should strike the community custody term and victim penalty assessment (VPA) from her sentence.

We affirm Mullins's conviction and remand to the trial court to strike the

community custody term and the VPA.

FACTS

Jessica Mullins was diagnosed with schizoaffective disorder bipolar type, which is a delusional disorder with bipolar aspects. On February 23, 2021, police officers in Aberdeen, Washington, took Mullins from the Aberdeen Jail to Grays Harbor Community Hospital for a mental health evaluation. While at the hospital, Mullins struck a nurse who was administering a COVID-19 test. She was charged with assault in the third degree for assaulting a nurse who was performing her nursing duties, pursuant to RCW 9A.36.031(1)(i). On October 27, Mullins pleaded guilty to assault in the third degree and submitted a recommendation for a MHSA. On December 6, the sentencing court granted Mullins a MHSA for 36 months and set a review hearing for January 18, 2022.

As part of the MHSA, the court imposed the following community custody conditions:

> The Defendant shall report to DOC not later than 72 hours after sentencing or release from custody at the address provided in open Court or by separate document. The Defendant shall comply with the instructions, rules, and regulations of DOC for the conduct of the Defendant during the period of community custody. The Defendant shall obey all laws, and perform affirmative acts as required by DOC to confirm compliance with the orders of the Court. The Defendant shall inform DOC of Court-ordered treatment upon the request of DOC. The Defendant shall comply with any other conditions of community custody stated in this Judgment and Sentence or imposed by DOC under RCW 9.94A.704 during community custody. While under supervision, the Defendant shall not own, use, or possess firearms or ammunition.

The court also ordered Mullins to do the following during the period of supervision:

- Pay all court-ordered legal financial obligations.
- Notify the community corrections officer in advance of any change in Defendant's address or employment.
- Report as directed to a community corrections officer.
- Comply with recommended treatment.
- Meet with treatment providers.
- Follow recommendations in individualized treatment plan.
- Not possess or consume controlled substances, including marijuana, without valid prescription.
- Obtain prior approval from DOC of residence location and living arrangements.
- Take all prescribed medications.
- Comply with monitoring of all prescribed medications.

On December 8, Mullins reported to DOC, but was not able to complete her intake because her Community Corrections Officer (CCO), Racquel Lanoue, was not in the office. Mullins was told to return the next day, which she failed to do. Mullins then reported to DOC on December 15, but was told to come back on December 28. Mullins returned to DOC several other times in the next month, but Lanoue testified that on the days Mullins reported, she would sign in and leave without completing an intake, despite protocol requiring supervisees to "speak to their assigned [CCO] or the duty officer." Lanoue also testified that other than the initial mental health report, she did not receive any reports from any health care providers about Mullins's treatment.

Mullins failed to appear at the scheduled review hearing on January 18, 2022, prompting the State to file a petition to revoke her MHSA. The following day, the court issued a bench warrant in accordance with the State's petition. After several hearings, on March 28, the sentencing court denied the State's petition to revoke Mullins's MHSA and signed an order permitting her to go to inpatient treatment.

3

Mullins was released from inpatient treatment on April 19. After Mullins's release, she reported to DOC on April 19 and completed her intake with Lanoue. On May 24, Lanoue reminded Mullins that when she reported to DOC she needed to speak with a CCO. At this time Mullins confirmed she was living at her transition housing with Coastal Community Action Program (CCAP). However, Lanoue testified that later, when she attempted to make contact with Mullins at her CCAP housing, the CCAP staff reported Mullins had "moved out" and left her medications. Lanoue stated that Mullins reported to DOC on May 31 and June 7 and signed in and left without speaking to a CCO.

On June 10, 2022, after receiving a report from DOC that Mullins was in violation of the MHSA, the State filed another petition to revoke Mullins's MHSA, which alleged that she (a) failed to get DOC approval to change her residence; (b) failed to comply with treatment; (c) failed to meet with her CCO; (d) failed to meet with treatment providers; and (e) failed to comply with taking her medications. On June 13, the trial court ordered and issued another bench warrant for Mullins's arrest based on the State's petition to revoke her MHSA.

During closing arguments at the hearing, on September 19, Mullins asked for "a pre-sentence investigation considering the nature of this case," but the court interjected and denied her request. When the court asked Mullins if she wanted to be heard regarding sentencing, her counsel stated:

> We are asking for the Court to impose a sentence outside of the standard range, because Ms. Mullins suffers from significant mental health issues, and that makes the 43 months in this case essentially cruel and unusual punishment. I think that the testimony did prove that Ms. Mullins does, in fact, suffer from a significant mental illness that made her compliance in this program impossible

4

without the appropriate community supervision that your Honor refused to implement.

The trial court imposed the maximum sentence of 57 months. The State then asked whether the court would make a finding that mental illness contributed to the offense, to which the court responded, "Yes," without additional explanation.

In its written findings of fact and conclusions of law, the trial court found that Mullins was unwilling "to engage in treatment, remain crime free, report to the Department of Corrections, take medication, abstain from the use of non-prescribed controlled substances, engage with any individualized treatment plan, or comply with any court order" and stated "[t]here is no indication that [she] will ever comply," and that her past behavior indicated she would continue not to comply with the MHSA. Based on its findings, the trial court concluded that she failed to comply with the MHSA requirements and, as such, revoked it and imposed 57 months incarceration and 12 months of community custody. The sentencing court also imposed a VPA and a mandatory condition requiring Mullins to pay for community supervision.

## DISCUSSION

Mullins challenges the trial court's September 19 judgment and sentence on several grounds. First, she claims her MHSA was improperly revoked. Further, she claims that the trial court deprived her of the right to counsel by repeatedly interrupting her during her closing statements and stopping her from completing her closing statement. She also claims that she was deprived of effective assistance of counsel when, following the revocation of her MHSA, her counsel did not attempt to obtain an exceptional sentence downward given that

her mental health is a mitigating factor. Finally, she argues that the court should remand to strike the community custody term and the VPA from her sentence.

I.    Revocation of the Mental Health Sentencing Alternative

Mullins claims that the trial court abused its discretion in revoking her MHSA because it misunderstood the statutory requirements that significant community support is needed to aid a defendant's compliance with the treatment plan that was not provided to her. She further assigns error to the court's findings of facts and conclusions of law that the facts indicated a "substantial and compelling reason" to revoke the MHSA. We address first what the statute requires before a court may revoke a MHSA. Then, we address Mullins's claim that the court abused its discretion in revoking her MHSA.

A.    Statutory Requirements for a MHSA

In 2021, the legislature created the mental health sentencing alternative (MHSA). LAWS OF 2021, ch. 242, § 1. A defendant is eligible for a MHSA if:

> (a) The defendant is convicted of a felony that is not a serious violent offense or sex offense;
> (b) The defendant is diagnosed with a serious mental illness recognized by the diagnostic manual in use by mental health professionals at the time of sentencing;
> (c) The defendant and the community would benefit from supervision and treatment, as determined by the judge; and
> (d) The defendant is willing to participate in the sentencing alternative.

RCW 9.94A.695(1).[1]

Mullins notes that the incarceration of persons with serious mental illness has increased along with correlative issues of substance abuse and homelessness due to a lack of resources. She suggests the legislature sought to target these issues by creating the MHSA, and, unlike other sentencing alternatives, it places affirmative obligations on CCOs and requires treatment providers to make "reasonable efforts" to involve the defendant in the treatment. Thus, Mullins claims the trial court improperly revoked her MHSA because her assigned CCO and treatment providers did not meet their statutory obligations to work with her to provide intensive supervision and make reasonable efforts to involve her in treatment.

Interpretation of a statute is a matter of law reviewed de novo. State v. Engel, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). The purpose of statutory interpretation is to understand legislative intent and give effect to that intent. Columbia Riverkeeper v. Port of Vancouver USA, 188 Wn.2d 80, 91, 392 P.3d 1025 (2017). The court discerns plain meaning from " 'the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.' " Randy Reynolds & Assocs. Inc. v. Harmon, 193 Wn.2d 143, 155, 437 P.3d 677 (2019)

---

[1] The legislature modified the MHSA statute in 2024. LAWS OF 2024, ch. 373, § 1. It added a new section (6) allowing the court and correctional facility to delay the defendant's release from total confinement to facilitate adherence to the treatment plan and a new section (13) that allows the health care authority to reimburse certain services. See RCW 9.94A.695(6), (13). The amendments also renumbered the sections starting with former section (7). Because these amendments do not impact the statutory language at issue here, we refer to the current statute.

(quoting Engel, 166 Wn.2d at 578). A reviewing court ends its inquiry if the plain language of the statute has a single interpretation. In re the Adoption of T.A.W., 186 Wn.2d 828, 840, 383 P.3d 492 (2016). However, if the plain meaning is ambiguous, then a reviewing court may look at the legislative history to determine the legislative intent. Jametsky v. Olsen, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). Finally, " 'shall' when used in a statute, is presumptively imperative and creates a mandatory duty unless a contrary legislative intent is shown." Goldmark v. McKenna, 172 Wn.2d 568, 575, 259 P.3d 1095 (2011).

If the sentencing court determines a MHSA is appropriate, it "shall impose" a term of community custody. RCW 9.94A.695(4). The court has discretion to determine the length of the term within certain ranges, which depend on the length of the standard range sentence.[2] RCW 9.94A.695(4).

Further, if a court imposes a MHSA, DOC "shall assign" a CCO to supervise the defendant, and DOC "shall provide" the CCO "with appropriate training in mental health to be determined by [DOC]." RCW 9.94A.695(5). DOC "shall provide a written report, which shall be in the form of a presentence investigation," and the report must include a proposed treatment plan and a proposed monitoring plan. RCW 9.94A.695(3). Specifically, the proposed treatment plan must identify the treatment provider who "is agreeing to provide treatment," including developing an individualized treatment plan to be submitted to the court. RCW 9.94A.695(3)(a)(i). The DOC report must also include "an

---

[2] The range is between 12 and 24 months if the midpoint of the standard range is less than or equal to 36 months, and between 12 and 36 months if the midpoint of the standard range sentence is longer than 36 months. RCW 9.94A.695(4).

agreement by the treatment provider to monitor the [defendant's] progress" and to notify DOC and the court "if reasonable efforts to engage the defendant fail to produce substantial compliance with court-ordered treatment conditions." RCW 9.94A.695(3)(a)(ii).

If the court imposes a MHSA, the court also "shall impose conditions under RCW 9.94A.703 [the Sentencing Reform Act of 1981's community custody provisions] that are consistent with the [MHSA statute] and may impose any additional conditions recommended by any of the written reports regarding the defendant." The court also "shall impose specific treatment conditions:"

> (i) Meet with treatment providers and follow the recommendations provided in the individualized treatment plan as initially constituted or subsequently modified by the treatment provider;
> (ii) Take medications as prescribed, including monitoring of compliance with medication if needed;
> (iii) Refrain from using alcohol and nonprescribed controlled substances if the defendant has a diagnosis of a substance use disorder.

RCW 9.94A.695(8)(b).

As Mullins notes, the MHSA is unique among other sentencing alternatives, such as the drug offender sentencing alternative (DOSA), in that, by design, it requires collaboration by the treatment provider, CCO, and representatives of the person's medical assistance plan to develop and monitor the treatment plan. The MHSA statute expressly states, "Treatment issues

arising during supervision shall be discussed collaboratively."[3] RCW 9.94A.695(9). The statute then contemplates that the defendant receive support for violations of treatment conditions:

> The treatment provider, community corrections officer, and any representative of the person's medical assistance plan shall jointly determine intervention for violation of a treatment condition. The community corrections officer shall have the authority to address the violation independently if:
> 　(a) The violation is safety related with respect to the defendant or others;
> 　(b) The treatment violation consists of decompensation related to psychosis that presents a risk to the community or the defendant and cannot be mitigated by community intervention. . . .; or
> 　(c) The violation relates to a standard condition for supervision.

RCW 9.94A.695(9). By giving the CCO authority to address certain violations, the MHSA statute suggests that not every violation results in a termination of the MHSA. Further, because the statute requires that the court receive updates on interventions, RCW 9.94A.695(10),[4] the implication is that not every intervention

---

[3] For example, while the DOSA statute imposes requirements on DOC as well as certain reporting requirements on treatment providers, it does not require that DOC and the treatment provider coordinate to the same degree as the MHSA statute does. See RCW 9.94A.664(3)(a) (requiring treatment provider to send treatment plan and written reports to the court); RCW 9.94A.660(4)(b) (to assist the court in making its determination, "the court may order the department to complete either or both a risk assessment report and a substance use disorder screening report"); RCW 9.94A.664(2)(b) (if the court orders residential treatment, DOC must make available substance use disorder assessment and treatment services, or domestic violence treatment services to a domestic violence offender, during any term of community custody, but only "within available resources").

[4] Further, the CCO, treatment provider, and "any engaged representative of the defendant's medical assistance plan should collaborate prior to a progress update to the court," and "[r]equired treatment interventions taken between court progress hearings shall be reported to the court" in regular updates.

results in a revocation hearing.[5]

The MHSA statute allows the court to schedule a review hearing "at any time to evaluate the defendant's progress with treatment or to determine if any violations have occurred." RCW 9.94A.695(11). At a review hearing, the court may modify the terms of community custody or impose sanctions. Id. Alternatively, "[t]he court may order the defendant to serve a term of total or partial confinement for violating the terms of community custody or failing to make satisfactory progress in treatment." Id.[6]

Further, "if the department or the state reports that the defendant has violated the terms of community custody," the court may schedule a termination hearing. RCW 9.94A.695(12). Otherwise, the court "shall schedule a termination hearing one month prior to the end of the defendant's community custody." Id.

We agree with Mullins that optimally, a MHSA allows a defendant to obtain treatment as an alternative to incarceration and, toward this end, the statute imposes obligations on DOC and treatment providers to support a defendant who receives a MHSA. The MHSA statute imposes obligations on DOC, the assigned CCO, and treatment providers to collaborate and create a treatment plan, to make reasonable efforts to involve a defendant in treatment, and to provide the

---

[5] While courts generally do not turn to legislative history as an interpretive aid unless a statute is ambiguous, we note that when the MHSA was originally introduced, the text did not include language such as "reasonable efforts," "collaborate," "collaboratively," or "jointly," to describe the relationship between the defendant, DOC, and treatment provider. S.B. 5293, 67th Leg. Reg. Sess. (Wash. 2021). However, the Senate Committee on Law and Justice explicitly made such changes to the bill, SECOND SUBSTITUTE S.B. 5293, 67th Leg. Reg. Sess. (Wash. 2021), which were adopted into the final law. See RCW 9.94A.695.

[6] In this regard, the MHSA is similar to the other sentencing alternatives that permit the court to revoke the alternative and impose a term of total confinement in the event the defendant violates a condition of the alternative or fails to progress in treatment. See RCW 9.94A.660(7)(c) (DOSA); 9.94A.655(8)(d) (Parenting Sentencing Alternative).

court with regular progress updates. And the statute provides options for managing violations, including giving the CCO authority to address conditions violations and allowing the department or the state to seek a review hearing or a termination hearing based on conditions violations.

Ultimately, however, the statute gives a court broad discretion to revoke a MSHA and impose a term of total confinement if *a defendant* either (1) violates the terms of community custody or (2) fails to make satisfactory progress in treatment. RCW 9.94A.695(11). Nothing in the plain language of the MHSA statute suggests that the failure of third parties to satisfy their statutory obligations limits the court's authority to revoke a MHSA, or excuses a defendant, for a violation of conditions.

###### B.     Order Revoking MHSA

With this legal framework for revocation of a MHSA in mind, we turn next to Mullins's assertions that the trial court abused its discretion when it revoked her MHSA (a) based on its misunderstanding of the statutory requirements and (b) based on its findings of fact that were not supported by substantial evidence. Specifically, she challenges finding of fact 8 and the court's conclusion of law 3 that the facts "indicate a substantial and compelling reason" to revoke the MHSA.

On appeal, we review a trial court's revocation of a sentencing alternative for an abuse of discretion. State v. McCormick, 166 Wn.2d 689, 705-06, 213 P.3d 32 (2009) (applying abuse of discretion standard to revocation of special sex offender sentencing alternative). A reviewing court will find an abuse of discretion "when the trial court's decision (1) adopts a view that no reasonable

person would take and is thus 'manifestly unreasonable,' (2) rests on facts unsupported in the record and is thus based on 'untenable grounds,' or (3) was reached by applying the wrong legal standard and is thus made 'for untenable reasons.' " State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012) (quoting State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

Additionally, appellate courts review findings of fact under a substantial evidence standard. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). Substantial evidence is "a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Id. If this standard is met, the reviewing court will uphold the trial court's findings even if the factual issue could have been resolved differently. Id. at 879-80. Additionally, unchallenged findings of fact are verities on appeal. State v. Garnica, 105 Wn. App. 762, 768, 20 P.3d 1069 (2001) (holding that the defendant's failure to assign error to the sentencing court's findings of fact rendered the facts verities on appeal).

First, Mullins challenges the trial court's finding of fact 8, which found:

[Mullins] has shown no willingness to engage in treatment, remain crime free, report to the Department of Corrections, take medication, abstain from the use of non-prescribed controlled substances, engage with any individualized treatment plan, or comply with any court order. There is no indication that [Mullins] will ever comply, and her past behavior indicates that she will continue to not comply with the [MHSA].

The State based its June 2022 petition to revoke in part on Mullins's failure to notify CCO Lanoue of a change of her address, failure to obtain approval from DOC "of her residence location and living arrangements", and failure to report to CCO Lanoue as directed. Regarding her residence, the

undisputed evidence was that Mullins left her transition house at CCAP without informing DOC. In fact, she was reportedly trespassed from the facility sometime after her release from inpatient treatment and after she departed from the facility. Further, there is no evidence that she obtained approval from DOC of any new residence location or living arrangements.

As to whether Mullins reported to her CCO as directed, initially, on December 8, 2021, Mullins reported to DOC, but Lanoue was not present, so Mullins was told to return on December 9. She again reported to DOC on December 15, but was told to report back on December 28. The record does not indicate whether on the dates Mullins reported to DOC, Mullins was directed to meet with an available CCO or how her DOC visits with her assigned CCO were to be scheduled. Nor does the record indicate any affirmative effort by Lanoue to contact Mullins until much later than Mullins's initial attempts to meet in December 2021.[7]

Nevertheless, at the February 2022 hearing on the State's initial petition to revoke, Mullins admitted to the conditions violations of failing to report to a review hearing in January and failing to report to CCO Lanoue. The court ultimately denied that petition to revoke and instead ordered Mullins to inpatient treatment. After completing this treatment, Mullins reported to DOC on April 19 and

---

[7] Mullins argues that Lanoue's testimony reflects that she did not have mental health training as required by the statute. RCW 9.94A.695(5) requires the CCO to be provided with "appropriate training in mental health to be determined by the department." Lanoue's testimony indicates that the extent of her training from DOC was "to go over the pre-sentence investigation reports that we would now have to be doing and the expectations of having mental health offenders now on our case loads," and that MHSA supervision would require her to "mak[e] sure that they're [sic] (supervisees) attending treatment, checking in with Department of Corrections, housing, medication compliance, chemical dependency." As the statute allows DOC to determine what is "appropriate," Mullins's argument that Lanoue lacked the requisite training is unavailing.

completed her intake with Lanoue that day. Lanoue testified that she spoke with Mullins only one more time after the intake meeting, on May 24, when she reminded Mullins that when she reported to DOC she needed to speak with a CCO. But the record shows that despite Lanoue's reminder, Mullins reported to DOC on May 31 and June 7 and signed in and left without speaking to a CCO. Thus, the record contains substantial evidence that Mullins did not report to her CCO as required by the MHSA.

The State also sought revocation of Mullins's MHSA based on her failure comply with her treatment, failure to meet with her treatment providers, including to follow her treatment plan, and failure to comply with monitoring of her medications. In finding of fact 1, which Mullins does not challenge, the court found that Mullins had an individualized treatment plan developed by the Community Integrated Health Services (CIHS), which had agreed to provide Mullins with treatment.[8] Further, the record shows that after the court amended the terms of Mullins's MHSA, Mullins participated in inpatient treatment from March 25, 2022 until April 19, 2022, received a medication shot for her schizoaffective disorder upon her release from inpatient treatment, and was reassessed by the flexible assertive community treatment (FACT) team upon her release from inpatient treatment. However, in unchallenged finding of fact 4, the

---

[8] The record on appeal does not contain Mullins's proposed treatment plan, either in the CCO's presentence report, which the statute requires to contain this information, or otherwise. Thus, the record does not allow us to assess directly whether there is substantial evidence that Mullins failed to comply with specific treatment conditions. The appellant has the burden of perfecting the record on appeal to ensure that the reviewing court is aware of all necessary evidence to decide the issues. Sisouvanh, 175 Wn.2d at 619 (citing RAP 9.2(b)). However, here, even without the treatment plan, the testimony and the court's unchallenged findings provide substantial evidence that Mullins violated her treatment plan.

court found that upon release, Mullins left CCAP, her prearranged sober living house, after only one day "and chose to live in the streets of Aberdeen"; she did not seek DOC's permission to do so, as required by the MHSA. Lanoue testified that Mullins left her medications behind at CCAP. Further, in findings of fact 5 and 7, also unchallenged, the court found that after Mullins left CCAP, she "did not comply with her individualized treatment plan" because she did not contact CIHS or engage in treatment and failed to comply with the requirement that "her medication regime be monitored." As Mullins did not challenge these findings, we treat them as verities, and together, along with the evidence in the record, they support the portions of finding of fact 8 that Mullins failed to engage in treatment, take medication, and engage with her individualized treatment plan.

Thus, substantial evidence supported the court's finding of fact 8 to the extent that it found Mullins did not "engage in treatment, . . . report to the Department of Corrections, take medication, . . . [or] engage with any individualized treatment plan." However, the substantial evidence does not necessarily support that Mullins "showed no willingness" and "would never comply" with certain conditions, as there was evidence that after the MHSA was imposed, she engaged in multiple efforts to meet with her CCO by going to the office and signing in; she met with Lanoue for intake after being released from inpatient treatment; she engaged in inpatient treatment; and she entered the sober living housing, CCAP. Thus, to the extent the court found Mullins "showed no willingness" to comply and that "[t]here is no indication that [Mullins] will ever comply, and her past behavior indicates that she will continue to not comply with

16

the [MHSA]," this language is too categorical and, to that extent, not supported by substantial evidence.[9]

But these unsupported aspects of finding of fact 8 are ultimately not necessary to support a finding of a violation. Substantial evidence supports the findings that Mullins did not "engage in treatment," "report to the Department of Corrections, take medication," or "engage with any individualized treatment plan." In turn, these findings, along with the unchallenged findings of fact, prove the conditions violations alleged by the State in its petition to revoke.

Nevertheless, Mullins also challenges the court's conclusion of law that the facts "indicate a substantial and compelling reason to revoke the [MHSA]." However, as discussed above, for a court to revoke a MHSA, the statute requires only that the defendant either (1) violates the terms of community custody or (2) fails to make satisfactory progress in treatment. RCW 9.94A.695(11); RCW 9.94A.695(12)(c) (court has authority to revoke a MHSA for violations of terms of community custody). The statute does not require a court to consider whether the failure of DOC, treatment providers, or others to satisfy their statutory obligations contributed to Mullins's lack of compliance with the MHSA.[10] Here, the

---

[9] Finding of fact 8 also states that Mullins did not "abstain from the use of non-prescribed controlled substances." The only testimony about whether Mullins failed to abstain was CCO Lanoue's testimony that she had not conducted urinalysis testing and did not know whether or not Mullins complied with this condition. Thus, in this respect, the finding is not supported by substantial evidence.

[10] The State points to the court's response at the revocation hearing to Mullins's counsel's charge that the court could have done more to help her:

I'm not sure who you think is going to ensure that your client complies with the treatment plan, because there was a treatment plan. She simply failed to appear. She stayed one day at the housing that was set up for her, she wasn't taking her medications, she wasn't checking in with her community corrections officer. So the people that were supposed to be treating her, she – she wasn't in contact with any of them. So who [is] supposed [sic] to solve that problem.

unchallenged findings from the revocation hearing as well as the supported portions of finding of fact 8 support the court's conclusion that Mullins violated the terms of her MHSA, and that there was a "substantial and compelling reason to revoke" her MHSA. Therefore, the court acted within its discretion in revoking Mullins's MHSA.

### C.     Deprivation of Right to Counsel at Closing

Mullins asserts that the trial court deprived her of her federal and state constitutional right to effective assistance of counsel when it interrupted her and ultimately stopped her from completing her closing argument.

A criminal defendant has a constitutional right to the assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. This includes the right to be heard at closing argument. Herring v. New York, 422 U.S. 853, 863-64, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975) (striking down a New York law allowing judges to prevent counsel from making a closing argument in non-jury criminal trial); State v. Perez-Cervantes, 141 Wn.2d 468, 474, 6 P.3d 1160 (2000). A trial court has broad discretion regarding the scope of counsel's closing arguments. State v. Frost, 160 Wn.2d 765, 771-72, 161 P.3d 361 (2007). However, a court abuses its discretion when it implicates a defendant's constitutional right to counsel by unduly limiting the scope of their closing argument based on a misunderstanding of the law. Frost, 160 Wn.2d at 778-79

---

The State contends this is evidence that the court's revocation was based on facts in the record was therefore acting within its discretion. While we disagree that the court's comments constitute evidence, they do indicate that the court properly understood its discretion under the statute to revoke a MHSA for conditions violations, regardless of others' alleged deficiencies in satisfying their statutory obligations.

(court was not authorized to compel the defendant's counsel to "argue logically").
While closing arguments are integral to a defendant's assistance of counsel
because they can be used to "sharpen and clarify the issues for resolution by the
trier of fact in a criminal case," a trial court is authorized to "terminate argument
when continuation would be repetitive or redundant." Herring, 422 U.S. at 862.

On appeal, a trial court's decision to limit the scope of a defendant's
closing argument is reviewed for an abuse of discretion. Frost, 160 Wn.2d at 771.
An abuse of discretion occurs when " 'no reasonable person would take the view
adopted by the trial court.' " Id. (quoting Perez-Cervantes, 141 Wn.2d at 475).

Mullins contends that the trial court interrupted and ultimately cut off her
closing argument in violation of her constitutional right to counsel and that its
actions were not harmless beyond a reasonable doubt. She asserts that in
closing she attempted to explain the differences of the MHSA and that she was
not provided with the support the statute required, but that the trial court
interrupted her and challenged this claim. Although she admits that she
erroneously asserted at trial that there had not been a progress hearing when
there had been, she points to the following exchange as evidence that the trial
court unduly limited her closing argument:

> Mullins: This should never have been brought as a petition to
> revoke. Your Honor has the authority to make the people in the
> community do what they are supposed to do and that is what hasn't
> been done.
>
> Court: [Mullins], you're rewriting history. That's not what happened
> in this case. When [] your client failed to appear at the progress
> hearing, a bench warrant issued for her. When she came back into
> custody, we had [] a hearing with her present.

19

Mullins's counsel then pointed to the court's overview of the procedural history of her case and the statement that she had not been around for any of her treating personnel to assist Mullins and countered the court's description of events:

> Mullins: Yes, she was. She appeared several times. It may not be at her appointment times, but she was around. A special –
>
> Court: Anything else, [Mullins]? What are you asking me to do today?
>
> Mullins: I'm asking you to keep the sentencing alternative in place, have an actual collaboration between the people who are supposed to be taking care of her in the community per the statute and to allow this to go forward in some kind of therapeutic housing scenario. . . . And the community, as a whole, is supposed to come together in mental health sentencing alternatives to find a solution that fits for the person. This is absolutely not what happened. And under Section 8, the community corrections officer has the authority to address the violation independently or with the community as long as it's safety related and consists of decompensation. That's what all of the testimony has said. The reason for all of this –
>
> Court: Thank you [].
>
> Mullins: -- is because she's decompensated –
>
> Court: That's all. Thank you.

Mullins argues that the trial court limited the scope of her closing argument in a way that deprived her from clarifying issues for the court's resolution.[11] She contends that this error was not harmless because the court's revocation was based on its misunderstanding of the MSHA, which she was attempting to clarify through argument, and therefore, by limiting her argument, she was deprived of assistance of counsel.

---

[11] Mullins also argues that the trial court was biased against her and that if we decide to remand her case should be reassigned to a different judge. However, the judge previously assigned to this case has since retired. Therefore, it is not necessary for us to address this issue.

The State counters that the trial court was attempting to restrict her argument to the facts in the record. According to the State, the trial court was simply disputing Mullins's claim that *DOC* was required to "oversee [her] mental health treatment" when RCW 9.94A.695(3)(a)(ii) assigns the *treatment provider* "to monitor the progress of the defendant on the sentencing alternative and notify the department . . . if reasonable efforts to engage the defendant fail to produce substantial compliance."

In the context of the challenged exchange, Mullins argued that the trial court had "authority to make the people in the community do what they are supposed to do." The court responded, "That [was] not what happened in this case," and recited facts regarding the court proceedings that had occurred. Mullins concedes she had incorrectly contended that a progress hearing had not been held. And even though Mullins disagreed with the court's description of events, she was not deprived of the opportunity to state her view of the proceedings. And to the extent the court was questioning Mullins's position that the State, or the court, was responsible for monitoring her treatment, Mullins had the opportunity to brief the relevant law before the hearing and presented evidence relating to those legal standards at the hearing. At the point when the court stopped the argument, Mullins's counsel had just explained her view of different actors' roles and responsibilities under the statute; she explained there was supposed to "have an actual collaboration between the people who are supposed to be taking care of her in the community per the statute and . . . some kind of therapeutic housing scenario," and that "the community corrections officer

has the authority to address the violation independently or with the community as long as it's safety related and consists of decompensation. That's what all of the testimony has said."

While Mullins disagrees with the court's decision to revoke her MHSA, she was not deprived of the opportunity to explain her interpretation of the MHSA statute through briefing and argument. And while she claims she would have clarified her argument and prevented the court from misinterpreting the statute, she does not identify with specificity what she was prevented from arguing that would have resulted in a different outcome. Therefore, we conclude that the trial court was within its discretion to limit the scope of her argument because it did so to limit the argument to facts in the record, and it had received briefing and heard argument on the issue.[12]

II.      Ineffective Assistance of Counsel

Mullins argues that her counsel was ineffective in failing to argue for a sentence below the standard range based on her mental health diagnosis as a mitigating factor.[13] We disagree.

Criminal defendants have a constitutional right to effective counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. A defendant is deprived of their

---

[12] A limit to the scope of closing argument is subject to harmless error review because it impacts the trial process. Frost, 160 Wn.2d at 781. Under a harmless error analysis, a reviewing court evaluates whether the untainted evidence is so significant that it nonetheless supports the conviction. Id. at 782. The error must be harmless beyond a reasonable doubt. Id. In Frost, the court held that the limit to the scope of closing argument was harmless error because counsel's argument was not itself evidence and other evidence of the defendant's guilt supported his conviction. 160 Wn.2d at 782-83. As in Frost, here, Mullins's closing argument was not evidence. Moreover, the hearing was not before a jury. Therefore, any error was harmless.

[13] Generally, a sentence within the standard sentence range cannot be appealed. RCW 9.94A.585.

right to effective assistance of counsel when (1) counsel's conduct falls below the objective standard of care and (2) counsel's deficient conduct prejudiced the outcome. Strickland v. Washington, 466 U.S. 668, 687,104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Defendants must satisfy both prongs of the Strickland test. State v. Jeffries, 105 Wn.2d 398, 418, 717 P.2d 722 (1986).

"Courts engage in a strong presumption counsel's representation was effective." State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). A defendant must overcome this "strong presumption" on both prongs of the Strickland test. State v. Bertrand, 3 Wn.3d 116, 123, 546 P.3d 1020 (2024). The court is not required to consider both deficiency and prejudice if a petitioner fails to prove one prong. In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012). The Strickland test is not applied mechanically but rather with focus on whether the proceedings were fundamentally fair. Bertrand, 3 Wn.3d at 123-24. A claim of ineffective assistance of counsel is reviewed de novo. State v. Backemeyer, 5 Wn. App. 2d 841, 848, 428 P.3d 366 (2018).

To show deficient performance, the defendant must show that counsel's representation fell below an objective standard of reasonableness in light of all the circumstances. Strickland, 466 U.S. at 688. However, any conduct that constitutes legitimate trial strategy cannot be deficient conduct. State v. Hendrickson, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996).

As to deficiency, Mullins contends that counsel's performance fell below the objective standard of reasonableness because it was so evident that her

mental health diagnosis was a mitigating factor.[14] She states that her mental health diagnosis qualifies as a mitigating factor under RCW 9.94A.535(1)(e) because it impaired her "capacity to appreciate the wrongfulness of [] her conduct, or to conform [] her conduct to the requirements of the law." Therefore, she contends that no reasonably prudent counsel would have failed to argue her mental health diagnosis as a mitigating factor, and her counsel was already attempting to argue for a lesser sentence under an Eighth Amendment cruel and unusual punishment theory.

RCW 9.94A.535 provides that a court "may impose an exceptional sentence below the standard range if it finds that mitigating circumstances are established by a preponderance of the evidence." And here, counsel did highlight Mullins's mental health diagnosis and asked for a lesser sentence. Counsel asked the court "to impose a sentence outside of the standard range, because Ms. Mullins suffers from significant mental health issues" and "the testimony did prove that Ms. Mullins does, in fact, suffer from a significant mental illness that made her compliance in this program impossible without the appropriate community supervision that Your Honor refused to implement." Thus, though counsel did not use the words "mitigating," they tied the request for an exceptional sentence to Mullins's mental health. Further, counsel had "wide latitude" to make the strategic decision to additionally make a constitutional

---

[14] The legislature intended mitigating factors to account for circumstances that distinguish blameworthiness from conduct that is normally consistent with a crime. State v. Hutsell, 120 Wn.2d 913, 921-22, 845 P.2d 1325 (1993) (quoting DAVID BOERNER, SENTENCING IN WASHINGTON §9.12(c) (1985)).

argument under the Eighth Amendment: "and that makes the 43 months in this case essentially cruel and unusual punishment."

Moreover, Mullins cannot establish prejudice as required under the second Strickland prong. For support, she cites State v. Grayson, in which the court held that a defendant is entitled to ask for an alternative sentence, and the trial court's failure to consider that alternative is reversible error. 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). Here, unlike in Grayson, the record demonstrates that the court here did not fail to consider the alternative sentence. Mullins asked for an alternative sentence, and the court was well aware of her mental health condition, as that was a statutory prerequisite for the MHSA. When the court initially imposed the MHSA, the order stated the standard range for assault in the third degree was 43-57 months, and the court imposed 36 months of MHSA custody, a below-standard range term. At the revocation hearing, the trial court heard Mullins's testimony regarding the impact that her mental health diagnosis had on her crime and on her MHSA. At the State's request, the court made a finding that mental illness contributed to the offense.

We conclude that Mullins cannot overcome the strong presumption that her trial counsel was effective, as their performance was not deficient or prejudicial.

III.     Grounds for Resentencing on Remand

   A.     Sentence Exceeds Statutory Maximum

Mullins contends, and the State agrees, that the trial court erroneously imposed a term of community custody without having authority to do so. A court

is limited to imposing sentences that are authorized by statute. In re Postsentence Review of Leach, 161 Wn.2d 180, 184, 163 P.3d 782 (2007). The applicable statute, former RCW 9.94A.695(11)(c), authorizes a trial court to "impose a term of total or partial confinement within the standard sentence range." But it does not authorize it to "impose a sentence that involves something other than confinement, such as community custody." In re Postsentence Review of Gardner, 32 Wn. App. 2d 474, 479, 556 P.3d 743 (2024). Therefore, when a defendant's MHSA is revoked, the trial court does not have authority to impose a term of community custody. Id. at 480.

Mullins was sentenced to 57 months of confinement, followed by 12 months of community custody for a total of 69 months. The State concedes that imposing a term of community custody was erroneous pursuant to Gardner. We accept the State's concession and remand to strike the term of community custody.[15]

### B. VPA and Community Supervision Fee

Mullins asks this court to strike the VPA based on recent changes to the law. The State does not dispute that the VPA should be stricken.

Pursuant to 2023 amendments, courts may not impose the VPA when the defendant is indigent. RCW 7.68.035(4). The sentencing court found Mullins to be indigent. The 2023 amendments to RCW 7.68.035 apply to matters pending

---

[15] Mullins originally also challenged the total length of her confinement and community custody as exceeding the statutory minimum as well as the imposition of mandatory community custody supervision fees based on recent changes in the law. Based on our determination that community custody should not have been imposed, we need not address these issues.

on direct appeal. <u>State v. Ellis</u>, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

We accept the State's concession and remand to strike the VPA.

CONCLUSION

We affirm Mullins's conviction and remand to the trial court to strike the term of community custody and the VPA from her sentence.

Chung, J.

WE CONCUR:

Birk, J.

Dwyer, J.